John HOPSON, Plaintiff,

v.

RIVERBAY CORPORATION, Joseph Nieves, and Robert Kelly, Defendants.

No. 99 Civ. 669 (AGS).

United States District Court, S.D. New York.

Nov. 17, 1999.

Albert A. Ebanks, Ebanks & Sattler, LLP, New York City, for Plaintiff.

Lisa M. Gibbons, Wilson, Elser, Moskowitz Edelman & Dicker, New York City, for Defendants.

## OPINION AND ORDER

SCHWARTZ, District Judge.

Following a trial by jury, the Court invited plaintiff to file a motion for a new trial under Rule 59(a) of the Federal Rules of Court Procedure. The Court stated that, on its own initiative, it was also considering ordering a new trial under Rule 59(d) of the Federal Rules of Civil Procedure. By order dated October 13, 1999 ("Memorandum Order") the Court provided the parties with notice and an opportunity to be heard on the matter. Plaintiff has now moved for an order (1) pursuant to Rule 59(a) of the Federal Rules of Civil Procedure setting aside the jury verdict rendered on October 8, 1999, and granting plaintiff a new trial and (2) pursuant to Title 28 of the United States Code § 1927, awarding attorneys fees, costs, and expenses and sanctioning counsel for defendants based upon defense counsel's improper conduct at trial. For the reasons set forth below, the Court GRANTS the motion to set aside the jury verdict and grants plaintiff a new trial and DENIES the motion for attorneys fees, costs, expenses, and sanctions.

## FACTS

Plaintiff has been employed for more than 27 years as a Correction Officer with the New York City Department of Correction. At all relevant times he worked on Rikers Island. Plaintiff resides in Co–Op. City, a large Mitchell–Lama development in the Bronx, owned and managed by defendant Riverbay Corporation. On April 7, 1997, plaintiff, having completed his tour of duty had returned to his apartment and had then driven to certain stores and was returning home when he was stopped by a Riverbay Safety Patrol vehicle. The vehicle was driven by Safety Patrol Officer Joseph Nieves, a defendant, accompanied by two other safety Patrol Officers, defendant Robert Kelly, in the passenger seat, and Safety Patrol Officer Williams, seated in the rear. Plaintiff and the defendant officers agreed that plaintiff exited his vehicle and approached the officers' vehicle and that officer Nieves, identified by witnesses as a large man, and his partner, Officer Kelly exited the marked patrol car. The officers wore blue uniforms with badges and were armed with weapons. Plaintiff, Mr. Hopson, was in civilian clothes.

The defendant officers testified at trial that they had stopped Mr. Hopson because he had been driving in an erratic manner, that he had veered across a double yellow line and that he had forced the patrol car to the side of the road, leading them to believe that he was intoxicated. Mr. Hopson denied all of this and testified that he did not drink intoxicating beverages and that he had not had a drink in fifteen or twenty years. Plaintiff testified that he approached the pa-

trol vehicle to have a word with the officers and that he had his finger in the air. Two eye witnesses, as set forth below, who had no relationship to plaintiff, confirmed that Mr. Hopson had exited his vehicle to approach the patrol car; one witness stating that he had seen Mr. Hopson with one finger raised. The other eye witness said plaintiff had both hands raised and he demonstrated that both hands were open. Officer Nieves testified, supported by Officer Kelly, that Mr. Hopson's hands were balled into a fist and that Mr. Hopson charged at him and that he, therefore, stepped aside and threw Mr. Hopson over the back of the patrol car, face down. Mr. Hopson testified that he sought only to talk to the officers and that he was punched about the head and face and then thrown down and handcuffed and then forced into the patrol car, bleeding from the nose.

The third officer seated in the patrol car, remained in the car for most of the altercation, offering testimony that tended to support his brother officers. Two New York City buses were standing, one behind the other, only a short distance from the scene. The drivers each witnessed the incident after the plaintiff's car and the safety patrol car had come to a halt. The bus drivers knew none of the parties but later came forward and were subpoenaed as witnesses for plaintiff. They testified that plaintiff was struck by Officer Nieves, roughly handcuffed and placed in the patrol car. One bus driver asked the officers what had happened and was told by Officer Nieves that plaintiff was "arrogant." There were also statements made by the officers indicating that they believed plaintiff was intoxicated. One of the bus drivers testified that plaintiff was struck a number of times. The other bus driver was so concerned that the officers would "rough" up plaintiff that he followed the patrol car in his bus until he saw that plaintiff was taken to a building, presumably to the Riverbay Safety Patrol Office.

The parties agree that plaintiff, cuffed, was taken to the Riverbay Safety Patrol Office, then to the 41st Police Precinct and then to the 45th Police Precinct. The parties agree that plaintiff told the officers that he was a Correction Officer and voluntarily turned over to the officers the weapon which he was carrying. Plaintiff was given a breathalyzer test at one of the Police precincts and was found to be not intoxicated. The breathalyzer reading was only .02. Plaintiff testified that he was cuffed for hours and that he repeatedly asked the officers to remove or to loosen the cuffs and that they refused to do so. He stated that he was denied the opportunity to go to the bathroom for hours and testified that he was placed, cuffed, in a holding cell at one of the precincts with other detainees. Plaintiff remained cuffed even though the other detainees were not. When plaintiff complained to an NYPD desk sergeant, he was told that he was in the custody of the Riverbay officers. Plaintiff was eventually allowed to place a call and he did so calling the Correction Department authorities at Rikers Island and his lawyer. After the Correction Department representatives and plaintiff's lawyer arrived at the precinct, plaintiff was given a desk appearance ticket and was charged with Resisting Arrest, Disorderly Conduct and Reckless Endangerment in the second degree. Although initially charged with DWI, that charge was dropped following the breathalyzer test. Plaintiff was ordered to appear in Bronx Criminal Court.

Subsequently, plaintiff did appear in Criminal Court where he accepted an Adjournment in Contemplation of Dismissal (ACD) and after six months all of the charges were dismissed. Plaintiff sued Riverbay and Officers Nieves and Kelly, as well as a third Riverbay officer, Sergeant Weir, and the New York City Police Department. The charges against the NYPD and Sergeant Weir were dismissed. The case proceeded to trial against defendants Riverbay and Officers Nieves and Kelly on claims under 42 U.S.C. § 1983 and state law claims of unlawful arrest, excessive force, malicious prosecution and related claims. The claim for malicious prosecution was dismissed on motion at the conclusion of plaintiff's case at trial on the grounds that the ACD which plaintiff had received in Criminal Court did not constitute a favorable termination, as a matter of law, an essential element of a malicious prosecution claim. See *Roesch v. Otarola*, 980 F.2d 850, 852 (2d Cir.1992); *Hazan v. City of New*

*York,* No. 98 Civ. 1716(LAP), 1999 WL 493352, \*3 (S.D.N.Y. July 12, 1999).

The case at trial turned entirely on the credibility of the parties, particularly the credibility of plaintiff. Misstatements of fact and law by defense counsel and apparent lack of justification for what were clearly repeated acts of misconduct denied plaintiff his opportunity for a fair trial and, in the opinion of the Court, so prejudiced the jury against him as to warrant setting aside the verdict and granting a new trial in this matter.

1. *Unfounded allegations that plaintiff had given a false alibi and had lied in Bronx Criminal Court.*

On cross examination defense counsel Lisa Gibbons of the firm of Wilson Elser Moskowitz Edelman & Dicker charged plaintiff with having lied in Bronx Criminal Court by filing an alibi statement denying that he had ever been at the scene of the arrest. On hearing this, plaintiff was clearly stunned. Waving a document in the air, Ms. Gibbons repeatedly charged that plaintiff had lied to that court, the clear implication being that having lied to that court, he was now lying to this court. Plaintiff, confused, said he knew nothing about it. His lawyer, Mr. Ebanks, objected and the Court asked counsel to approach the bench. The Court asked Ms. Gibbons to hand over the document she was waving before the jury. The document was nothing more than the printed notice under New York State Criminal Procedure Law § 250.20 [1] that the Bronx District Attorney's Office routinely sends to defendants requesting notice of any alibi the defendant may have. Nothing in the document, a copy of which is annexed, indicated that Mr. Hopson had ever responded to such notice or ever, at any time, stated that he had an alibi or that he was not at the scene. The trial transcript reads as follows:

Q. And you actually filed what they call an alibi notice in this case, didn't you? In other words, you filed a notice saying that

you couldn't have done this because you weren't there.

A. I'm not understanding.

MR. EBANKS: I'm constrained to object.

THE COURT Overruled. Go ahead.

Q. What was your answer, sir?

A. I didn't understand the question.

Q. Okay.

THE COURT: The question is did you file an alibi notice in the criminal court saying that you weren't there?

THE WITNESS: I'm still not understanding that, your Honor.

THE COURT: Go ahead, Ms. Gibbons.

MS. GIBBONS: Thank you, Judge, I don't think I'm going to do a better job than you, but I'll try.

Q. You came to court with your attorney to answer for the charges, or in other words, to appear before the judge on the day that you were supposed to.

A. Yes.

Q. In connection with this criminal case, the reckless endangerment, the disorderly conduct and the resisting arrest, correct?

A. Yes.

Q. And at that time when you were informed formally of the charges on behalf of you, your attorney filed a notice of alibi, in other words: Judge, I did not do this and I couldn't have done it because I wasn't there, is that correct?

MR. EBANKS: Objection, your Honor.

THE COURT: Overruled. did you ever do that or know that your attorney ever did anything like that?

THE WITNESS: I don't know anything about that, your Honor.

THE COURT: You don't know anything about that. Okay.

Q. Would it surprise you to know that he did serve an alibi notice on your behalf?

A. Yes, it would surprise me.

---

1. N.Y.S. Crim. Proc. Law § 250.20 provides that:

At any time, not more than twenty days after arraignment, the people may serve upon the defendant or his counsel, and file a copy thereof

with the court, a demand that if the defendant intends to offer a trial defense that at the time of the commission of the crime charged he was at some place or places other than the scene of the crime . . . .

(Jury not present)

MR. EBANKS: Your Honor, I'd like to make a record.

THE COURT: Ms. Gibbons, let me see the alibi notice.

MR. EBANKS: I'll show it to you.

MS. GIBBONS: I have it marked, I'm just looking for it, Judge.

THE COURT: Let's see it.

(Handed to the Court)

MR. EBANKS: The record should reflect, Judge, that it's signed by the Bronx District Attorney. It's their demand for an alibi.

THE COURT: What I'm looking at here is a document which is a form of the District Attorney's Office in the Bronx which is a notice which the District Attorney routinely serves on defendants asking whether they have an alibi. It's part of the discovery permitted under New York State Criminal Procedure Law.

MS. GIBBONS: Yes, Judge, I'm aware of that.

THE COURT: Has the defendant ever signed anything stating that he was asserting an alibi?

MS. GIBBONS: Hold on, Judge. I may have misread it.

Defense counsel's display before the jury was without any foundation or truth whatever. The Court gave a curative instruction to the jury but the harm was done. This was only the first of a number of unfair acts by Ms. Gibbons and Wilson, Elser. As to this incident, it should be noted that Ms. Gibbons, as she had informed the Court at a conference, was not unschooled in state criminal procedure. She had been an Assistant District Attorney in Kings County for five and a half years prior to joining Wilson Elser.

2. *Unfounded claim that Mr. Hopson had been the subject of more than two charges at disciplinary proceedings brought by the Department of Correction.*

Plaintiff, a correction officer with 27 years service testified that as a result of this arrest he had been the subject of *two* disciplinary charges filed against him by the Department of Correction, one for his violation of law and unbecoming conduct and the other for his failure to timely report the arrest.[2] Ms. Gibbons, on cross examination, stated that he had faced more than *two* charges. Plaintiff repeated that he had only faced two charges. In effect, Ms. Gibbons now accused Mr. Hopson of lying to the jury about the disciplinary proceedings. Again the Court asked Ms. Gibbons to approach at a sidebar where she was asked to produce the document, a copy of which is annexed. The document clearly reflected that Mr. Hopson had faced *two* charges. Each charge identified the departmental rules involved. One charge listed three rules; the other charge listed two rules. *But there were only two charges.*

Defense counsel, in response to the motion, has now submitted another document entitled "Confidential Closing Memorandum" dated May 4, 1999 from an attorney, Audrey Lipford, to Assistant Commissioner Carl Di-Carlo, that recites various rules and a directive and recommends an administrative penalty of "Reprimand With Expungement after 6 months". This document was *not* the exhibit shown to the Court, nor was it included among the exhibits in the Joint Pre–Trial Order, dated August 24, 1999. The only relevant exhibit that *was* included as part of Exhibit A to the Joint Pre–Trial Order clearly reflected that plaintiff had *two* charges against him and listed two rules in support of one charge and three rules in support of the other. More importantly, all of the charges had no evidentiary weight. Mr. Hopson had not been tried and convicted of a violation of any rule or directive. He had conferenced the matter at the Office of Administrative

---

2. It should be noted that the rules that plaintiff was alleged to have violated related to the charges in Bronx Criminal Court which were later dismissed. The second charge, failure to have timely reported his arrest, was made not-withstanding that plaintiff had filed his report of the arrest in three days and had also called the Correction Department immediately and they responded by coming to the police precinct within hours of his arrest.

Trials and Hearings where the Chief Administrative Judge found that "[Mr. Hopson] has an excellent time and leave record with no latenesses and no days lost to such leave from and including 1986 though April 1999——nearly 13 years" and settled the matter with a reprimand and expungement after 6 months "given C.O. Hopsons' long tenure with the Department and strong service record." (Exh. H. to Gibbons Aff. dated Nov. 5, 1999.)

In sum, defense counsel misrepresented the facts with regard to the number of charges and the disposition before the Office of Administrative Trials and Hearings and, more importantly, dramatically presented this irrelevant matter to the jury as evidence of alleged perjury by plaintiff, all of which was untrue.

An attorney has an obligation to present information to a jury, after careful review and consideration, and in a fair manner. The Court again gave a curative instruction. In this instance, it is not unlikely that the jury, presented with two different statements as to a legal matter, that of Mr. Hopson, a layman, and that of Ms. Gibbons and the associate seated with her, would accept the lawyer's version of the document. Mr. Hopson was now presented as having lied about the two proceedings in which he had been involved as a result of his arrest, the Criminal Court proceeding and the disciplinary proceeding. The implication was that he would not hesitate to lie in this Court as well.

### 3. *Counsel's misrepresentation of the intoxication issue.*

At the outset of this two and a half day trial (followed by a day and a half of jury deliberations) defense counsel told the jury that defendants were not contesting the fact that Mr. Hopson was *not* intoxicated at the time of the incident. Both sides agreed that Mr. Hopson had voluntarily taken a breathalyzer test at the precinct and that he had passed it with a blood alcohol reading of only .02. Nothing in the record or offered by defense counsel suggested that a reading of that low level could not be obtained from any person, even a teetotaler. Ms. Gibbons, it should be noted, had earlier made an *in limine* motion to preclude plaintiff's counsel from cross examining her client, Officer Kelly, as to the fact that such defendant had previously been convicted of driving while intoxicated. Plaintiff proposed to cross-examine as to that conviction principally to impeach the officer's credibility as a witness but also to show that he had been negligently hired by Riverbay. The Court granted the *in limine* motion, holding that the conviction did not relate to credibility and that, balancing the issues, to introduce such evidence would be unfairly prejudicial to Officer Kelly and that that prejudice outweighed any probative value that the evidence might have had. *See* Fed.R.Evid. 403.

For the same reason, the Court granted defendant's motion *in limine* precluding plaintiff from examining officer Nieves as to the fact that Officer Nieves had, on another occasion, negligently shot Officer Kelly. With those rulings in hand, Ms. Gibbons, notwithstanding her concession that Mr. Hopson had not been intoxicated, cross examined him extensively on the issue. She accused him of lying when he said he did not drink at all and had not done so for fifteen or twenty years and certainly not that day. She did so by telling the jury, in her questions and on summation that a .02 blood alcohol reading was clear evidence that he had been drinking. She repeatedly made this assertion notwithstanding the fact that there was no evidence in the record that such a low reading *must* have been the product of drinking an alcoholic beverage, rather than from food intake or medication or other innocent reason.

In her cross-examination she told the jury that a reading of .05 was deemed alcohol impairment under state law, a statement that was clearly erroneous. In fact, New York State Vehicle and Traffic Law § 1195 2(a) provides:

Evidence that there was .05 of one per centum or less by weight of alcohol in such person's blood shall be prima facie evidence that the ability of such person to operate a motor vehicle *was not impaired* by the consumption of alcohol, and that such person was not in an intoxicated condition.

New York State Vehicle & Traffic Law § 1195 2(c)[3] requires a reading that there was *more* than .07 but less than .1 for there to be prima facie evidence that a driver's ability to operate a motor vehicle was impaired.

Once again, a curative instruction was given, but the damage was done.

### 4. *Defense counsel's misleading statements on summation.*

Although plaintiff, the three officers in the Riverbay Patrol Car and the two bus driver witnesses testified that plaintiff had exited his vehicle and walked towards the Riverbay patrol car, Ms. Gibbons repeatedly mischaracterized plaintiff's testimony on summation stating that he had said that he had been "dragged" from his car. She was, thereby, suggesting that plaintiff was the *only* person testifying to this version of a key part of the events and was doing so falsely, exaggerating what the officers had done. Ms. Gibbons did this repeatedly in her summation, *even after objection had been sustained.*

MS. GIBBONS: The only one in this courtroom that ever said he was pulled over was the plaintiff. Even the two so-called independent guys said he wasn't pulled over, he pulled over and he got out. *He says he was dragged out of the car, violently—*

MR. EBANKS: Objection, your Honor, I don't believe there's any testimony—

THE COURT: The objection is sustained. There's no testimony that he was dragged out of the car violently or otherwise. I'm sustaining the objection.

MS. GIBBONS: *Ladies and gentlemen, you have the testimony read back. It's my recollection that the plaintiff said he was dragged out of the car.*

THE COURT: Ladies and gentlemen, let me say, the fact is that you will be the sole finders of the facts. It's not what I recall, it's not what Ms. Gibbons recalls or Mr. Ebanks recalls. You will recall the fact

and it is your recollection that prevails, and you may, if you wish, have exhibits or the record read back to you.

\* \* \* \* \* \*

Notwithstanding the Court's having sustained the objection, Ms. Gibbons pressed on, repeating the erroneous statement.

MS. GIBBONS: We'd all love to have ²⁰⁄₂₀ hindsight but it's about what they thought at the time and what was reasonable. I submit to you, ladies and gentlemen, there is absolutely no doubt that those officers acted reasonably, they saw the plaintiff commit reckless endangerment and that's what they arrested him for.

*Now, what's the next charge they say? First of all, the only guy that says he was pulled over and taken out of the car is the plaintiff.*

MR. EBANKS: Objection.

MR. SATTLER Objection, your Honor.

THE COURT: Objection sustained. The plaintiff has not said that.

MS. GIBBONS: Yes, Judge.

Further dramatizing these misstatements, she then referred to her own clients, with obvious irony, as these "animals." The summation materially misrepresented the record and was calculated to confuse the jury.

Defense counsel neither denies nor justifies the repeated misstatements to the jury. Instead, defendants contend that comments made by plaintiff's counsel on summation were grossly inappropriate, scurrilous, and clearly inflammatory. The Court does not disagree that the statements by plaintiff's counsel referred to in Defendants's Memorandum in Opposition to Plaintiff's Motion for a New Trial (pp. 12–14) were improper and excessive and should have been stricken by the Court. However, *defendants' misstatements followed the Court's having sustained an objection.* The repetition by defense counsel was willful and repetitive and made notwithstanding the ruling by the Court that had just been made. Most impor-

---

**3.** NY Veh. & Traffic Law § 11952.(c) reads:
Evidence that there was *more than .07* of one per centum *but less than .10 of one per centum by weight of alcohol in such person's blood shall be prima facie evidence that such person*

was not in an intoxicated condition, but such evidence *shall be given prima facie effect* in determining whether the ability of *such person* to operate a motor vehicle *was impaired by the consumption of alcohol.* (emphasis supplied)

tantly, the misstatements went to a key element of the testimony by *all* witnesses to the event. The effect of repeatedly misstating plaintiff's testimony, taken together with all of defense counsel's other misrepresentations on this subject, could only have adversely affected the jury.

5. *Defense counsel's representation that they had authority to settle and the request that the Court become involved and the conference with plaintiff's counsel, as a result of incomplete disclosures by defense.*

Defense counsel during pre trial conferences stated that defendants would not consider settlement of this action. The Court was informed by both counsel that the trial would take only a few days. During the presentation of plaintiff's case at trial and after the testimony of the two independent witnesses, the bus drivers who had seen the arrest and handcuffing of plaintiff, Ms. Gibbons, outside the presence of the jury, informed the Court and plaintiff's counsel that "I have authority to settle" and asked that the Court meet separately with counsel. She asked, and plaintiff's counsel consented, that she meet first with the Court.

Ms. Gibbons, in the robing room, told the Court that Riverbay had $50,000 available for a settlement and that the "excess carrier" would contribute an additional $50,000 *if the court obtained a "commitment"* from plaintiff's counsel that plaintiff would settle for the $100,000. The Court then met separately with plaintiff's counsel whose demand was substantially higher than the $100,000. The Court, believing that defense counsel was acting in good faith and had made full disclosure of their authority and their clients' position, pointed out to plaintiff's counsel that notwithstanding the facts presented, there were issues such as whether (i) defendants were "state actors" under § 1983, (ii) a claim for malicious prosecution would lie where plaintiff had accepted an adjournment in contemplation of dismissal (iii) plaintiff had any compensatory damages where he had not lost any wages and had no medical expense of any substantial nature, etc. Plaintiff's counsel reluctantly gave the Court their "commitment" which they confirmed with their client,

of his acceptance of the $100,000 settlement. Ms. Gibbons was then separately told this by the Court and was asked to call the "excess carrier" and communicate this fact. Ms. Gibbons, after placing a call, then reported that she could not reach the carrier and, thereafter that the carrier would not agree.

Did Ms. Gibbons and Wilson Elser who interrupted the trial to raise the issue of settlement, have the "authority" to settle? The settlement was of no consequence in terms of judicial resources; the trial had, at best, another day or so to go. The interruption of plaintiff's case and the requested intervention of the Court did, however, have an obvious impact on plaintiff's counsel. The wind was clearly out of plaintiff's sails. Was Ms. Gibbons acting in good faith when she asked the Court to speak with plaintiff's counsel with regard to the requested "commitment?" The Court, after having been told that the excess carrier would not settle, told Ms. Gibbons that her representation that she had had authority and her request for judicial intervention was, at best, inappropriate. Thereafter, Mr. Kaminsky, a Wilson Elser partner, asked to speak with the Court and supported Ms. Gibbons. Mr. Kaminsky disclosed for the first time, that there was a disagreement between entities as to the share of the settlement to be borne by each of them. This fact had not previously been disclosed to the Court and, if it had, the Court would not have put plaintiff and plaintiff's counsel in the position it did.

The jury dismissed all claims except for one under state law for emotional distress as against defendants Nieves and Kelly and awarded plaintiff $2,300 as punitive damages against the two officers.

### *DISCUSSION*

1. *New trial warranted because of attorney misconduct*

■ Pursuant to Fed.R.Civ.P. 59(a)(1), new trials may be ordered "for any of the reasons for which new trials have heretofore been granted", including attorney misconduct. *See Starter Corp. v. Converse, Inc.,* No. 95 CIV. 3678(CSH), 1997 WL 391266, *1 (S.D.N.Y. July 11, 1997), *rev'd on other*

*grounds,* 170 F.3d 286 (2nd Cir.1999) ("Reasons frequently asserted on Rule 59 motions include prejudicial errors of law ... and misconduct of counsel or court which tainted the verdict."); *see also* 11 C. *Wright, A. Miller & M. Kane, Federal Practice and Procedure: Civil* 2d § 2809 ("If a verdict has been unfairly influenced by the misconduct of counsel a new trial should be granted.").

■ Trial courts possess broad discretion to determine when the conduct of counsel is so improper as to warrant a new trial. *See Pappas v. Middle Earth Condominium Assoc.,* 963 F.2d 534, 540 (2d Cir.1992). In *Pappas,* the leading Second Circuit case on new trials as a result of attorney misconduct, the court stated:

> We recognize the trial court's superior vantage point when evaluating the possible impact of the alleged prejudicial conduct. A printed record is unable to replicate in full all the circumstances—for example, tones of voices, demeanor of witnesses and jurors and the like—that occur in the course of an unfolding trial. *See, e.g., Johnson v. Celotex Corp.,* 899 F.2d 1281, 1289 (2d Cir.1990).

*Pappas,* 963 F.2d at 540. Consequently, the district court's determination as to whether counsel's improper conduct caused prejudice is reviewed under the abuse of discretion standard. *See, e.g., Id.; Smith v. Lightning Bolt Productions, Inc.,* 861 F.2d 363, 370 (2d Cir.1988).

■ As the Second Circuit has noted, while not all misconduct of counsel taints a verdict to such a degree as to warrant a new trial, "when the conduct of counsel in argument causes prejudice to the opposing party and unfairly influences a jury's verdict, a new trial should be granted." *Pappas,* 963 F.2d at 540; *see also Smith v. Lightning Bolt Prods., Inc.,* 861 F.2d 363, 370 (2d Cir.1988) ("The judge's duty is essentially to see that there is no miscarriage of justice. If convinced that there has been then it is [the judge's] duty to set the verdict aside ...."); *cf. Int'l Ore & Fertilizer Corp. v. SGS Control Servs., Inc.,* 38 F.3d 1279, 1287 (2d Cir. 1994) ("[A]bsent a showing of clear error or manifest injustice, it will generally be appropriate to deny relief pursuant to Rule 59

since litigants should neither be required nor without good cause permitted to relitigate already-decided matters."). In reviewing counsel's misconduct for prejudicial effect, the Court must consider the "totality of the circumstances" including "the nature of the comments, their frequency, their possible relevance to the real issue before the jury, the manner in which the parties and the court treated the comments". *Hynes v. LaBoy,* 887 F.Supp. 618, 631 (S.D.N.Y.1995); *see also Bergstein v. Jordache Enterprises, Inc.,* No. 90 Civ. 1461(SAS), 1996 WL 271910, at *1–*2 (S.D.N.Y. May 21, 1996) (stating that in considering Rule 59 motions, courts "should view the verdict in the overall setting of the trial, consider the character of the evidence and the complexity or simplicity of the legal principles which the jury was bound to apply to the facts"). Conduct that is "de minimis in the context of the entire trial" or that is appropriately dealt with by curative instructions, is not sufficient to warrant a new trial. *See Pappas,* at 540.

■ In this case, the numerous misstatements of fact and law and repeated acts of misconduct by defense counsel were not "de minimis in the context of the entire trial", and in the "totality of the circumstances" the Court's curative instructions did not suffice to remove the taint of prejudice. The acts of misconduct include the unfounded allegations that plaintiff had given a false alibi and had lied in Bronx Criminal Court, an unfounded claim that Mr. Hopson had been the subject of more than two charges at the Department of Corrections disciplinary proceedings, a clearly erroneous misstatement of the alcohol impairment law, misleading statements on summation over sustained objections, and defense counsel's misrepresentation that she had authority to settle. While the Court issued curative instructions where applicable, it is the view of the Court that they did not suffice to cure the prejudice, in light of the repeated nature of the misconduct. *See, e.g., Koufakis v. Carvel,* 425 F.2d 892, 904 (2d Cir.1970) ("[W]here the number and gravity of counsel's improprieties reach the level presented by this record, the admonitions by the trial judge in the charge and in response to

specific objections cannot possibly serve to cure all the prejudice.").

In *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 206 (3d Cir.1992), a grant of a new trial was affirmed when counsel, inter alia, prejudicially referred to facts not in evidence and made numerous impassioned remarks casting aspersions on the credibility of the witnesses such as "the nerve" of the witnesses to perjure themselves "with a straight face". *Id.* at 210. The Third Circuit concluded, as had the district court, that "cautionary instructions given to the jury proved to be insufficient to immunize the jury from the improper and inflammatory remarks of plaintiffs' counsel", when such remarks were manifold. *Id.* at 206, 210. The court in *Fineman* also asserted: "Often ... a combination of improper remarks" is necessary "to persuade us of prejudicial impact". *Id.* at 207; *see Koufakis*, 425 F.2d at 901 ("Repeated improprieties by one counsel severely prejudice his adversary."). In another attorney misconduct case, *Draper v. Airco, Inc.*, 580 F.2d 91, 96 (3d Cir.1978), as in *Fineman*, a curative instruction did not suffice based in part on the numerous instances of misconduct at issue. There as here, the Court's curative instructions do not suffice to cure the prejudice engendered by counsel's misconduct. The Court finds that the cumulative effect of counsel's misconduct, notwithstanding the curative instructions created sufficient prejudice to mandate a new trial.

#### 2. *Sanctions*

▬ The Court notes at the outset that while trial courts have wide discretion in assessing sanctions, *see Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 154 (2d Cir.1997), the Second Circuit has cautioned the courts to "be sensitive to the impact of sanctions on attorneys", *Oliveri v. Thompson*, 803 F.2d 1265, 1280 (2d Cir.1986), and has restrictively interpreted the court's inherent power to sanction: "[W]e have declined to uphold awards ... absent ... clear evidence that challenged actions are entirely without color, and [are taken] for reasons of harassment or delay ...." *Oliveri*, 803 F.2d at 1272 (citations omitted); *see id.* at 1273 (holding that

same standard applies to court's power to sanction under 28 U.S.C. § 1927).

Here, defendants' counsel's misrepresentations, the unfounded claims concerning the fact that plaintiff had offered a false alibi, and those concerning the charges that the Department of Corrections brought against plaintiff, the misstatement of the alcohol impairment law, and the misleading statements on summation, are not "entirely without color" such that they were made solely "for reasons of harassment and delay". Instead, defense counsel's statements distorted the facts or law at issue. There is a question whether these acts were the result of negligent preparation or reckless and willful conduct or lack of discipline. The Court also accepts that plaintiff's counsel's comments on summation, although not pointed, were excessive, inappropriate, and inflammatory. The Court declines to impose sanctions against defense counsel under these circumstances. In addition, the grant of a new trial will serve the purpose of sanctions against defense counsel without the deleterious impact of the sanctions themselves.

### *CONCLUSION*

This Court has never previously set aside a jury verdict and does so in this case solely for the reason that it believes that the verdict was the result of the impact on the jury of defense counsel's deliberate or reckless misconduct and its effect on plaintiff's credibility. Here credibility, plaintiff's credibility, was *the* issue. Defense counsel either wilfully or recklessly misrepresented what plaintiff did and what he testified to and materially misstated the state law applicable to important issues. The jury, in the view of the Court was affected by defense counsel's misstatements, all of which served to deny to plaintiff the fair trial to which he was entitled as a matter of law.

Accordingly, the Court grants the motion to set aside the jury verdict and grants plaintiff a new trial and denies plaintiff's motion for attorney's fees and sanctions. Issues as to costs and expenses will be determined at the conclusion of the trial.

Counsel for the parties are directed to appear on December 2, 1999 at 10:00 a.m. for

purposes of scheduling further proceedings, including a date for the new trial.

SO ORDERED.