Robert **GRAHAM**, Plaintiff,

v.

**CITY OF NEW YORK**, William Glenn and Andrew Ugbomah, Defendants.

**No. 08–CV–3518 (MKB).**

United States District Court, E.D. New York.

Signed Sept. 10, 2015.

---

Brett H. Klein, Lissa Strata Green–Stark, Leventhal & Klein, LLP, Brooklyn, NY, for Plaintiff.

Elizabeth M. Daitz, Max Oliver McCann, Brian Francolla, New York City Law Department, New York, NY, for Defendants.

## MEMORANDUM & ORDER

MARGO K. BRODIE, District Judge:

Plaintiff Robert Graham and his son, J.G., filed the above-captioned action on August 27, 2008, alleging that the City of New York and New York City Police Department ("NYPD") officers violated their constitutional rights in violation of 42 U.S.C. § 1983, and committed the state torts of assault, battery, intentional inflict of emotional distress, false arrest, abuse of process, and various forms of negligence. (Docket Entry No. 1.) In a Second Amended Complaint filed on August 28, 2009, Defendants William Glenn and Andrew Ugbomah were personally named. (Docket Entry No. 18.) By Memorandum and Order dated August 17, 2011, United States District Judge Kiyo A. Matsumoto [1] granted Defendants partial summary judgment as to all of J.G.'s claims. (Docket Entry No. 52.) By Memorandum and Order dated March 6, 2013, the Court granted Defendant Ugbomah summary judgment on Plaintiff's assault and battery claims, and denied Defendants summary judgment on all other claims. (Docket Entry No. 71.) On August 11, 2014, the Court commenced a jury trial on Plaintiff's remaining claims that (1) Glenn falsely arrested Plaintiff in violation of Section 1983 and state law, and Ugbomah failed to intervene; (2) Glenn used excessive force against Plaintiff, and Ugbomah failed to intervene; (3) Glenn subjected Plaintiff to assault; (4) Glenn subjected Plaintiff to battery; and (5) the City of New York is liable for Plaintiff's state law claims under the *respondeat superior* doctrine.

At the conclusion of trial, Defendants moved for judgment as a matter of law. The Court reserved judgment and submitted the case to the jury for deliberations. (Minute Entry dated August 13, 2014.) The jury deliberated and returned a ver-

1. This action was transferred to the under- signed on March 30, 2012.

dict in favor of Plaintiff as to his false arrest claim against Glenn and corresponding failure to intervene claim against Ugbomah, and in favor of Defendants on all other claims. (Docket Entry No. 100.) The jury awarded Plaintiff $150,000 in compensatory damages. (*Id.*) Defendants now renew their motion for judgment as a matter of law and, in the alternative, move for a new trial. For the foregoing reasons, Defendants' motion for judgment as a matter of law pursuant to Rule 50(b) and motion for a new trial pursuant to Rule 59 are denied.

## I. Background

### a. Factual background

The Court assumes familiarity with the underlying facts and procedural history of this case as set forth in earlier decisions concerning this matter. *See Graham v. City of New York,* 928 F.Supp.2d 610 (E.D.N.Y.2013) (granting in part and denying in part motion for summary judgment); *Graham v. City of New York,* No. 08–CV–3518, 2011 WL 3625074 (E.D.N.Y. Aug. 17, 2011) (granting motion for partial summary judgment as to J.G.'s claims); *Graham v. City of New York,* No. 08–CV–3518, 2010 WL 3034618 (E.D.N.Y. Aug. 3, 2010) (overruling Magistrate Judge's grant of plaintiffs' motion for protective order, denying motion for a protective order). The Court briefly summarizes the testimony as presented at trial.

On June 8, 2007, at approximately 5:30 PM, Plaintiff and his four-year old son, J.G., were in their vehicle on Church Avenue, near the intersection of East 96th Street in Brooklyn, New York. (Tr. 310:14–311:22.) Defendant police officers Glenn and Ugbomah were in their marked police vehicle on Church Avenue, attempting to respond to a 9–1–1 call regarding an emergency at Church Avenue and Rockaway Parkway, one block from Plaintiff's location. (Tr. 65:22–67:11.) As the officers' vehicle approached the intersection of Church Avenue and East 96th Street, they did not have their lights or sirens on. (Tr. 68:18–69:16.) Glenn and Ugbomah pulled behind Plaintiff and attempted to get around Plaintiff's vehicle, chirping the sirens at Plaintiff. (Tr. 70:1–71:15.) When Glenn realized that they could not drive any further due to the traffic conditions, caused by a red light at the intersection, Glenn pulled into the bus stop to Plaintiff's right, behind a bus that was pulling out of the stop and into traffic. (Tr. 70:18–72:10, 74:25–76:10, 312:14–313:24.) The police car became boxed in, and Glenn could not maneuver around either the bus or the traffic in the street, and he gestured to Plaintiff to move right and backward, alongside the back of the bus, so that he could drive around Plaintiff's vehicle. (Tr. 76:11–24, 78:20–79:11, 83:6–18, 316:1–13.) Plaintiff gestured back by putting his hands up in an inquiring manner, attempting to indicate his belief that he could not move, which Glenn interpreted as a gesture of exasperation.[2] (Tr. 79:17–21, 316:13–17.) Glenn stepped out of the vehicle and asked for Plaintiff's documents, and had taken either Plaintiff's license or registration and insurance information from Plaintiff when the traffic light turned green and traffic began moving forward.[3]

**2.** Defendants testified that, at this point, Ugbomah got out of the car and proceeded to the destination on foot. (Tr. 88:7–9, 175:19–22.) Plaintiff testified that Ugbomah never left the vehicle. (Tr. 318:23–319:2.)

**3.** Glenn testified that he asked for Plaintiff's driver's license, registration and proof of insurance, and had taken his registration and insurance when he left. (Tr. 87:22–88:17.) Plaintiff testified that Glenn asked only for his driver's license, and took that with him when the light turned green. (Tr. 371:6–318:4.) J.G. testified that the officer took Plaintiff's license, drove away for fifteen or twenty minutes, and returned and asked Plaintiff for a "white paper." (Tr. 257:3–21, 267:15–22.)

(Tr. 87:22–88:17, 317:6–318:4.) Glenn returned to the police vehicle and drove it to Rockaway Parkway, with the document, and Plaintiff stayed where he was. (Tr. 88:21–23, 99:1–5, 318:5–11.)

Plaintiff waited, in his vehicle, at the intersection of Church Avenue and East 96th Street for up to twenty minutes [4] until Glenn returned in the vehicle. (Tr. 320:20–321:8.) Plaintiff's air conditioning did not work and it was a hot day. (Tr. 95:19–20, 307:20–25.) When Glenn returned, he demanded the rest of Plaintiff's documents—either his driver's license, or his registration and proof of insurance—which he never ended up taking. (Tr. 94:18–95:11, 321:23–323:10.) Plaintiff asked Glenn what he was going to do, and Glenn and Plaintiff had a brief conversation or argument,[5] in which Glenn warned Plaintiff that he could be issued a summons or arrested. (Tr. 100:18–20, 321:23–322:21.)

Glenn pulled Plaintiff out of the vehicle, pushed Plaintiff against the car, handcuffed Plaintiff in front of J.G., and placed Plaintiff under arrest. (Tr. 101:21–102:20, 105:5–107:13, 322:22–323:7.) Glenn told Plaintiff that someone needed to pick up J.G., or J.G. would be left with the Administration for Children's Services. (Tr. 108:3–109:6, 327:8–24.) An acquaintance, Yvonne Fraser, was walking by and offered to take J.G. back to school, which she did, and Glenn placed Plaintiff in the back seat of his police vehicle. (Tr. 109:7–25, 290:18–291:17, 328:25–329:1.) The handcuffs were tight and Plaintiff complained that they were too tight, and irritated an area of his arm where he had recently had surgery. (Tr. 178:21–179:3, 325:21–326:23.) After Plaintiff continued to complain, Glenn addressed the problem either by loosening the handcuffs or removing them.[6] (Tr. 114:9–12, 144:5–6.) After speaking with Plaintiff for a short time, Glenn issued Plaintiff a summons for disorderly conduct.[7] (Tr. 50:3–16, 111:14–112:2, 334:6–23; Pl. Ex. 1.) In total, Plaintiff spent about thirty-six minutes in the police car before he was released. (Tr. 160:23–161:3.) Ugbomah was in and out of the car, still looking for the complainant in the emergency to which they had been responding, but he was present when

---

J.G. could not remember when Glenn requested Plaintiff's driver's license. (Tr. 267:2–4, 10–14.)

4. Glenn testified that he did not believe as much as fifteen or twenty minutes had elapsed between the time he left Plaintiff in his vehicle and his return from Rockaway Parkway. (Tr. 96:12–23, 98:22–25.)

5. The parties gave conflicting testimony as to this conversation. Glenn testified that Plaintiff refused to hand over his license when he told Plaintiff he was going to give Plaintiff a summons. (Tr. 95:4–11.) Plaintiff proceeded to argue with Glenn about whether he could have moved, and said that if Glenn was going to give him a summons, Plaintiff was not going to give Glenn his license. (Tr. 101:6–14.) Glenn warned Plaintiff that he would be arrested if he did not comply, and Plaintiff began to get "loud and boisterous," at which point Glenn continued to warn him and asked

him to get out of the car, and Plaintiff refused. (Tr. 101:6–20.) Plaintiff testified that he was in the process of handing his registration and insurance information to Glenn, but Glenn never took it from him. (Tr. 321:23–323:10.) Plaintiff testified that he simply told Glenn that he could not have moved his vehicle and asked what he had done wrong, at which point Glenn became angry and pulled his car door open. (Tr. 322:8–23.)

6. Plaintiff testified that no one loosened the handcuffs before they were taken off. (Tr. 333:8–10.)

7. Defendants contend that Plaintiff could have been charged with failure to yield to an emergency vehicle, obstruction of governmental administration and disorderly conduct. (Tr. 57:18–22, 88:15–17, 107:10–13.) However, Glenn decided to only issue him a summons for disorderly conduct. (Tr. 111:20–25.)

Glenn was placing Plaintiff under arrest. (Tr. 153:14–24, 175:23–176:3, 321:15–21, 329:11–15.)

Glenn made two mistakes in filling out the summons, including failing to specify a subsection of the disorderly conduct statute. (Tr. 113:24–114:8.) Plaintiff reported to court, as required, on August 29, 2007, and received notice that a legally sufficient accusatory instrument was never filed in court and thus the matter had been dismissed. (Tr. 334:24–336:9.)

### b. Conclusion of proceedings and jury verdict

At the conclusion of Plaintiff's case, Defendants moved for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure on the grounds that: (1) Plaintiff's claim for false arrest against Ugbomah fails as a matter of law because there is no evidence of intent to confine Plaintiff; (2) Plaintiff's claim for false arrest against Glenn fails because Glenn had probable cause to arrest for failure to yield to an emergency vehicle and for obstruction of governmental administration; (3) Plaintiff's claim for excessive force fails because the force used was *de minimis;* (4) Plaintiff's assault and battery claim fails because Glenn's contact with Plaintiff was privileged; (5) there was insufficient evidence to support Plaintiff's claims against Ugbomah on a failure to intervene theory; and (6) Defendants were entitled to qualified immunity and state law immunity for all claims. (Tr. 448:25–452:1.) The Court reserved ruling on Defendants' motion,[8] and Defendants rested without presenting further evidence. (Tr. 463:2–7.) Defendants also requested that the jury make specific findings of fact to enable the Court to determine qualified

immunity as to the false arrest and excessive force claims. (*See* Tr. 415:13–422:9.) The Court submitted the case to the jury.

The jury found that Plaintiff had proved by a preponderance of the evidence that Glenn falsely arrested him on June 8, 2007, and that Ugbomah failed to intervene in the false arrest. (Verdict Sheet, Ct. Ex. 1 at 1, Docket Entry No. 100.) It determined that Plaintiff had not proved his other claims by a preponderance of the evidence. (*Id.* at 1–2.) Plaintiff was awarded $150,000 in compensatory damages and no punitive damages. (*Id.* at 2.) The jury also made findings of fact on a special verdict sheet, separate from the general verdict sheet. (Special Verdict Sheet, Ct. Ex. 2, Docket Entry No. 100–1.) The questions and answers found by the jury are reproduced below:

1. Did defendant Glenn indicate that the plaintiff should move his vehicle into the bus stop on June 8, 2007? Yes X No _____

2. Could the plaintiff have moved his vehicle into the bus stop when he was asked to do so on June 8, 2007? Yes _____ No X

3. Could the plaintiff have backed up his vehicle when he was asked to do so on June 8, 2007? Yes _____ No X

4. Did defendant Glenn direct the plaintiff to exit his vehicle? Yes X No _____

5. Did the plaintiff refuse to exit his vehicle? Yes ... No X

(*Id.*) After the jury presented its findings, Defendants renewed their Rule 50 motion

---

**8.** During argument on Defendants' Rule 50 motion, the Court—upon consent of the parties—determined that it would be more appropriate to alter the verdict sheet to reflect that Plaintiff's false arrest and excessive force

claims against Ugbomah were premised on a failure to intervene theory, and were not additional, independent claims. (Tr. 457:3–462:16.)

and requested that the Court set aside the verdict as "inconsistent with the evidence as to liability and damages." [9] (Tr. 594:5–7.) Defendants now move for judgment as a matter of law pursuant to Rule 50(b) on the grounds that the jury's verdict as to Plaintiff's false arrest claims is against the weight of the evidence, and that Defendants are entitled to qualified immunity and state law immunity. Defendants also move for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure, arguing that the trial resulted in a seriously erroneous verdict and a miscarriage of justice due to: (1) Plaintiff's and his counsel's misconduct, (2) several erroneous rulings from the Court, (3) an inconsistent verdict, and (4) an excessively high jury award which, Defendants argue, should be vacated in favor of a new trial or reduced as objectively unreasonable.

## II. Discussion

### a. Standards of review

#### i. Rule 50

 Rule 50 of the Federal Rules of Civil Procedure allows a court to set aside a jury's verdict if the court finds that "a reasonable jury would not have a legally sufficient evidentiary basis to find" as it did. Fed.R.Civ.P. 50(a)(1), (b); *Cash v. Cty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (Judgment as a matter of law is only appropriate "when 'a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.' " (quoting Fed.R.Civ.P. 50(a)(1))). In reviewing a motion brought under Rule 50, "[t]he court must consider the evidence in the light most favorable to the non-movant and 'give that party the benefit of all reasonable inferences that the jury

might have drawn in his favor from the evidence,' " bearing in mind that a jury is free to believe or disbelieve any part of a witness' testimony. *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir.2012) (quoting *Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir.2007)); *Zellner*, 494 F.3d at 371. Accordingly, the court may "disregard all evidence favorable to the moving party that the jury is not required to believe." *Zellner*, 494 F.3d at 371 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 135, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). The moving party thus bears a heavy burden, especially where, as here, "the jury has deliberated in the case and actually returned its verdict in favor of the non-movant." *Cash*, 654 F.3d at 333 (internal quotation marks omitted); *Bakalor v. J.B. Hunt Transp., Inc.*, No. 11–CV–2911, 2013 WL 3185546, at *1 (S.D.N.Y. June 24, 2013). "A judgment notwithstanding the verdict may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it." *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 112 (2d Cir.2015) (internal quotation marks omitted); *see also Cash*, 654 F.3d at 333.

#### ii. Rule 59

 Pursuant to Rule 59 of the Federal Rules of Civil Procedure, "[a] court may grant a new trial 'for any reason for which a new trial has heretofore been granted in an action at law in federal court. . . .' " *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417 (2d Cir.2012)

---

9. Defendants did not specifically renew their motion as to qualified immunity, but the Court construes their statement that the evidence was inconsistent "as to liability" to include immunity from suit.

(quoting Fed.R.Civ.P. 59(a)(1)(A)). Grounds for granting a new trial include a verdict that is against the weight of the evidence, *Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir.2003), substantial errors in the admission or exclusion of evidence, *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 203 (2d Cir.2014), prejudicial misconduct from counsel, *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 540 (2d Cir.1992), and non-harmless errors in jury instructions, *United States v. Kozeny*, 667 F.3d 122, 130 (2d Cir.2011), or verdict sheets, *Armstrong ex rel. Armstrong v. Brookdale Univ. Hosp. & Med. Ctr.*, 425 F.3d 126, 136 (2d Cir.2005). A jury's verdict should "rarely be disturbed" and a motion for a new trial should be granted only if the court is convinced that the jury's verdict is "seriously erroneous or a miscarriage of justice." *Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 635 (2d Cir.2002) (per curiam); *see also Carroll v. Cty. of Monroe*, 712 F.3d 649, 653 (2d Cir.2013); *Raedle*, 670 F.3d at 417–18. Such evaluations should be made with a "high degree of deference ... to the jury's evaluation of witness credibility...." *ING Global v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97–98 (2d Cir.2014) (quoting *Raedle*, 670 F.3d at 418).

### b. Judgment as a matter of law

Defendants contend that they are entitled to judgment as a matter of law on Plaintiff's false arrest claim because (1) the evidence in the record was not legally sufficient to form a basis for the jury's verdict, because Defendants had probable cause to arrest Plaintiff for obstructing governmental administration ("OGA"), and (2) Defendants were entitled to qualified immunity and state law immunity because it was objectively reasonable for them to believe that they had probable cause to arrest Plaintiff for OGA.

In assessing Fourth Amendment claims of false arrest brought under Section 1983, courts generally look to the law of the state in which the arrest is alleged to have occurred. *Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007). "To avoid liability for a claim of false arrest, an arresting officer may demonstrate that either (1) he had probable cause for the arrest, or (2) he is protected from liability because he has qualified immunity." *Simpson v. City of New York*, 793 F.3d 259, 265 (2d Cir.2015) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir.1996)); *Thompson v. City of New York*, 592 Fed. Appx. 36, 37 (2d Cir.2015) (noting that probable cause is a complete defense to a false arrest claim, whether it is asserted under New York state law or Section 1983); *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir.2006) (noting that, under New York law, probable cause is a complete defense to a claim of false arrest). "An arresting officer has probable cause [for an arrest] when the officer has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime[.]'" *Simpson*, 793 F.3d at 265 (quoting *Weyant*, 101 F.3d at 852); *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir.2013) (same). Under New York Law, a person is guilty of OGA when he intentionally (1) "prevents or attempt[s] to prevent" (2) a public servant, from (3) performing an official function (4) "by means of intimidation, physical force or interference, or by means of any independently unlawful act...." N.Y. Penal Law § 195.05; *see also Cameron v. City of New York*, 598 F.3d 50, 68 (2d Cir.2010) (quoting *Lennon v. Miller*, 66 F.3d 416, 424 (2d Cir.1995)); *Zellner*, 494 F.3d at 376.

### i. There was a legally sufficient basis for the verdict

Defendants argue that there is no legally sufficient basis to find Glenn and Ugbomah liable for false arrest because Plaintiff refused to comply with two of Glenn's lawful orders, and "refusal to comply with a lawful order can constitute probable cause to arrest for" OGA. (Def. Mem. 13–14.) Specifically, Defendants argue that they had probable cause to arrest Plaintiff when he refused to back up his vehicle, and again when he refused to hand his documents—either driver's license or registration and proof of insurance—to Glenn upon request, both of which gave Glenn probable cause to arrest Plaintiff for OGA.[10] (*Id.*) Plaintiff argues that the jury was entitled to believe his competing testimony that he (1) could not back up his vehicle because traffic was bumper-to-bumper, and (2) did provide his documents, though Glenn never took them. (Pl. Opp'n 16–19.)

■■■ Defendants' argument improperly assumes that the jury must have accepted their version of the facts: that Plaintiff had space to move his vehicle, and that he did not provide his documents. Construing the evidence in the light most favorable to Plaintiff, as the Court must, there was sufficient evidence to support the jury's finding that Glenn did not have probable cause to arrest Plaintiff and therefore falsely arrested him. As to Plaintiff's apparent refusal to move his car, the jury concluded that Plaintiff could not have moved his vehicle either into the bus stop or backward when Glenn asked him to do so. (Special Verdict Sheet 1.) Despite Defendants' contention otherwise, Plaintiff's testimony clearly indicated that, although he could provide no specific measurement in feet, based on his experience driving, he believed that there was less than five feet of space behind him and he could not reverse his vehicle any further. (Tr. 392:23–393:4.) Plaintiff testified that he did not believe he could move, and that backing up any further would have been dangerous and may have caused an accident. (Tr. 316:6–17, 392:6–10.) The jury was free to credit Plaintiff's testimony over Glenn's contention that there was space for Plaintiff to move his vehicle into, and it is not the Court's province, on a Rule 50 motion, to disturb the jury's decision to do so. *See Cash,* 654 F.3d at 333; *Zellner,* 494 F.3d at 371 ("The court is not permitted to find as a fact a proposition that is contrary to a finding made by the jury."); *Mickle v. Morin,* 297 F.3d 114, 121 (2d Cir.2002) ("As the jury was not required to believe the disputed accounts given by either of the defendants, the court was required to disregard their testimony. . . . The court could not instead embrace defendants' versions of the circumstances as the basis for granting them judgment as a matter of law."); *Slack v.*

---

10. Defendants only argue that the arrest was privileged because Defendants had probable cause to arrest Plaintiff for OGA, therefore the Court addresses only that argument here. The Court addresses Defendants' contention that any failure to comply with a lawful police officer may constitute probable cause to arrest for OGA, *infra* part II.c.ii.2.A. As discussed *infra,* at least one New York State court has specifically concluded that "mere verbal refusal" to provide an officer with a driver's license, registration and proof of insurance cannot constitute OGA. *People v. Alston,* 9 Misc.3d 1046, 805 N.Y.S.2d 258, 260–61 (N.Y.Crim.Ct.2005). However, whether Plaintiff's actions, as Defendants described them, actually constituted OGA is not the question before the Court on Defendants' Rule 50 motion. The question is whether the testimony, read in the light most favorable to Plaintiff, shows that there was probable cause to arrest Plaintiff. As discussed below, the Court finds that the evidence presented at trial showed that Plaintiff did not refuse to comply with Glenn's orders, and rather was either unable to or was not provided with the opportunity to fully comply.

*Cty. of Suffolk*, 50 F.Supp.3d 254, 264–65 (E.D.N.Y.2014) (upholding jury's verdict finding defendant officer liable for Section 1983 false arrest claim, noting the "jury could have reasonably discredited [defendant's evidence] as unreliable"). Furthermore, once the light turned green, there is no dispute that the police vehicle was able to proceed to the scene of the emergency without issue—Plaintiff made no attempt to block Glenn's way, and pulled his car to the side of the road. (Tr. 297:20–298:3.) If Plaintiff had no room to reverse his vehicle while stuck in traffic, construing the evidence in the light most favorable to Plaintiff, Glenn could not have reasonably believed that Plaintiff was intentionally preventing Glenn from responding to the emergency, and Glenn therefore did not have probable cause to arrest Plaintiff for OGA.

Similarly, the jury was not compelled to accept Defendants' contention that Plaintiff refused to hand his driver's license to Glenn.[11] Plaintiff contends that he had the documents in his hand and was in the process of giving them to Glenn when he paused to ask Glenn "What are you going to do?" (Tr. 321:22–322:8.) Plaintiff testified that Glenn could have taken the registration at this time but Glenn never did, instead engaging in a brief conversation with Plaintiff before he ordered Plaintiff out of the car. (Tr. 322:9–23, 397:3–10.) Plaintiff did not pull the documents back or say he was not going to give them to Glenn. (Tr. 323:11–14.) Defendants argue that Plaintiff's characterization of his actions is false, and appear to contend that no reasonable juror would believe him because "[o]ne cannot pause in the middle of a completed act," and that by failing to place the documents in Glenn's hand, Plaintiff admitted that he did "not fully comply with [Glenn's] order."[12] (Def. Mem. 14.) The Court has no indication of the jury's actual findings on this question because Defendants did not request a special interrogatory as to these facts. Defendants are "not [now] entitled to have the [C]ourt, in lieu of the jury, make the needed factual finding" unless the conclusion is one the jury was required to draw. *Zellner*, 494 F.3d at 368. Construing all of the evidence in the light most favorable to Plaintiff, the jury was not required to conclude that Plaintiff refused to provide Glenn with his documents. The jury was entitled to credit Plaintiff's testimony that he held the documents in the middle of his open window and that Glenn could have taken the documents from him, and it was not "compelled" to accept Defendants' view that Plaintiff failed to comply with the direction. *See Cash*, 654 F.3d at 333; *Zellner*, 494 F.3d at 373. If Plaintiff did hold out his documents as he testified, Glenn's failure to remove them from Plaintiff's hand did not give Glenn probable cause to arrest Plaintiff for OGA. *See Dowling v. City of New York*, No. 11–CV–4954, 2013 WL 5502867, at *8 (E.D.N.Y. Sept. 30, 2013) ("The New York cases are clear that mere words, without more, do not satisfy the standard for obstructing governmental administration.").

### ii. Defendants are not entitled to immunity from suit

Defendants contend that they are entitled to qualified immunity and state immunity, because it was objectively reasonable for them to believe that probable cause existed or, in other words, officers of rea-

---

**11.** As discussed *infra,* the Court is dubious as to whether this fact alone would have given Glenn probable cause to arrest Plaintiff for OGA.

**12.** In other words, Defendants argue that Plaintiff's "full[ ] compl[iance]" with Glenn's order is dependent on Plaintiff either placing the documents in Glenn's hand, or Glenn's independent act of removing them from Plaintiff's hand.

sonable competence could disagree on whether probable cause existed. (Def. Mem. 14–15.) Plaintiff argues that Defendants are not entitled to qualified immunity because their factual arguments were considered and rejected by the jury and were within the realm of findings a reasonable jury could make, and because Defendants failed to request a special interrogatory as to whether Plaintiff refused to provide his registration. (Pl. Opp'n 20–21.)

A police officer is entitled to qualified immunity from suit brought pursuant to Section 1983 if either "(1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Simpson*, 793 F.3d at 268 (internal quotation marks omitted); *see also Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (noting that the qualified immunity doctrine entitles officers to immunity from suit and is not just a defense from liability). The second prong of the test thus requires that officers only have "arguable probable cause," meaning "either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Simpson*, 793 F.3d at 268 (quoting *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir.2004)); *see also Zellner*, 494 F.3d at 367 (" '[I]f officers of reasonable competence could disagree' as to whether probable cause existed, 'immunity should be recognized.' " (alteration in original) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986))). " '[A]rguable' probable cause should not be misunderstood to mean 'almost' probable cause. If officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer." *Gonzalez*, 728 F.3d at 157 (quoting *Jenkins v. City of New York*, 478 F.3d 76, 86–87 (2d Cir. 2007)).

Under New York State law, qualified immunity has both an objective and subjective component: the officer must be acting within his discretion, and must not have been acting with bad faith or without a reasonable basis. *Lore v. City of Syracuse*, 670 F.3d 127, 166 (2d Cir.2012) (noting immunity only available for discretionary actions, and is not available if the officer was acting in bad faith); *Hargroves v. City of New York*, No. 03–CV–1668, 2014 WL 1271024, at *3 (E.D.N.Y. Mar. 26, 2014) ("Under New York law, officers are entitled to qualified immunity where 'there is bad faith or the action is taken without a reasonable basis.' " (quoting *Blouin ex rel. Estate of Pouliot v. Spitzer*, 356 F.3d 348, 363–64 (2d Cir.2004))); *cf. Arzeno v. Mack*, 39 A.D.3d 341, 833 N.Y.S.2d 480, 481 (2007) (finding that "since probable cause existed and [the defendant officer's] actions were reasonably based, no bad faith was shown and he was entitled to qualified immunity" as to false arrest claim). The objective components of the New York qualified immunity analysis are "essentially[ ] coextensive" with the reasonableness inquiry embedded in the federal standard. *Hargroves*, 2014 WL 1271024, at *3 (citing *Jones v. Parmley*, 465 F.3d 46, 64 (2d Cir.2006)).

Defendants argue that they are entitled to qualified immunity because Glenn's behavior was objectively reasonable based on the same factual contentions the Court rejected above.[13] Where, as

---

**13.** There is no doubt that the right not to be subject to a warrantless arrest without proba-

ble cause was clearly established at the time

here, the testimony presents factual issues as to whether Defendants' actions were reasonable under the circumstances, Defendants are "not entitled to judgment as a matter of law on a defense of qualified immunity." *Mickle*, 297 F.3d at 122; *see also Bradley v. Jusino*, 374 Fed.Appx. 144, 147 (2d Cir.2010) (finding that where the facts supporting probable cause to arrest for OGA or disorderly conduct were disputed, defendant's argument that he was entitled to judgment as a matter of law because he had probable cause to arrest plaintiff "necessarily fails because the facts asserted are disputed and, for purposes of qualified immunity, a court must assume their resolution in favor of [plaintiff]"). As discussed above, a reasonable jury could have concluded that Plaintiff did not fail to comply with either of Glenn's directives. Taking those facts as true, "it would not be objectively reasonable for any reasonably competent officer to believe" that Plaintiff's inability to reverse his vehicle, decision to wait at the intersection until Glenn returned from the emergency, and decision to ask Glenn a question while he held out his insurance and registration documents—which documents Glenn did not take from Plaintiff—constituted OGA. *See Zellner*, 494 F.3d at 377; *Dowling*, 2013 WL 5502867, at *8 (denying summary judgment on qualified immunity grounds for false arrest, noting "mere words" do not constitute OGA, and officer must have had reasonable belief plaintiff was doing something other than voicing his disagreement or complaining); *see also Simpson*, 793 F.3d at 269 (finding that officer who witnessed plaintiff enter back of bus at direction of bus driver and wait in line to pay her bus fare could not have reasonably concluded that plaintiff intended to commit theft of services "any more than a reason-

able officer could have concluded that a person at the grocery store directed to a checkout counter and waiting in line to pay for produce intended to commit petit larceny"); *Rucks v. City of New York*, 96 F.Supp.3d 138, 151–52, 2015 WL 1433383, at *12 (S.D.N.Y.2015) (denying motion for judgment as a matter of law, finding officers not entitled to qualified immunity on false arrest claim because "no reasonable officer could have concluded that there was probable cause to arrest [p]laintiff for having his feet on the seats" in violation of transit rules, when the jury specifically found that plaintiff was sitting with his feet on the floor).

Reviewing the facts in the light most favorable to the non-moving party, and giving due deference to the jury's credibility determinations and reasonable factual conclusions, the Court will not set aside the verdict. Defendants' motion for judgment as a matter of law is denied.

### c. Motion for a new trial

Defendants move for a new trial pursuant to Rule 59, arguing that a number of violations led to a seriously erroneous verdict or a miscarriage of justice. Defendants contend that (1) Plaintiff and his counsel engaged in repeated misconduct which showed "disregard" for the Court's authority and the judicial process, (2) the Court committed several errors in its evidentiary rulings and jury instructions, which led the jury to a seriously erroneous result, and (3) the jury reached an inconsistent verdict which was contrary to law and erroneous on its face.

### i. Counsel's conduct does not require a new trial

Defendants argue that Plaintiff and his counsel engaged in "blatant misconduct"

of Plaintiff's arrest. *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir.2007); *Lee v. McCue*, No. 04–CV–6077, 2007 WL 2230100, at *2 (S.D.N.Y. July 25, 2007) (noting that

"the right not to be arrested without probable cause was clearly established at the time of the incident in question").

and a "pattern of ethical violations" that amounted to a "flagrant disregard for the authority of the Court and the integrity of the judicial process," forcing Defendants to object "in front of the jury" several times. Defendants contend that, viewed in the context of the trial as a whole, Plaintiff's misconduct warrants a new trial as to Plaintiff's claim of false arrest only, with the admonishment that Plaintiff and his counsel "should show at least a modicum of respect for the Court's orders." (Def. Mem. 12.) Plaintiff asserts that he and counsel did not engage in any prejudicial misconduct, and that Defendants' motion—which, Plaintiff notes, lacks citation to any legal authority—consists primarily of unsupported attacks on Plaintiff and his counsel, and fails to demonstrate that a new trial is warranted under Rule 59. (Pl. Opp'n 6.)

A court considering a motion for a new trial based on opposing counsel's misconduct must be mindful that "not all misconduct of counsel taints a verdict to such a degree as to warrant a new trial." *In re Fosamax Prods. Liab. Litig.*, 742 F.Supp.2d 460, 477 (S.D.N.Y.2010) (quoting *Pappas*, 963 F.2d at 540). A new trial is warranted only where counsel's conduct prejudices the opposing party or unfairly influences the jury's decision. *Tesser v. Bd. of Educ. of Sch. Dist.*, 370 F.3d 314, 321 (2d Cir.2004); *In re Fosamax*, 742 F.Supp.2d at 477. Thus, in evaluating a motion for a new trial based on counsel's alleged misconduct, the court "must consider such a claim in the context of the trial as a whole, examining, among other things, the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, and the manner in which the parties and the court treated the comments." *Claudio v. Mattituck–Cutchogue Union Free Sch. Dist.*, 955 F.Supp.2d 118, 144 (E.D.N.Y.2013) (quoting *Levitant v. N.Y.C. Human Res.*

*Admin.*, 914 F.Supp.2d 281, 311 (E.D.N.Y. 2012)); *In re Fosamax*, 742 F.Supp.2d at 477. Determining if counsel's conduct was so improper as to warrant a new trial is committed to the sound discretion of the trial judge. *Patterson v. Balsamico*, 440 F.3d 104, 119 (2d Cir.2006) (citing *Matthews v. CTI Container Transp. Int'l Inc.*, 871 F.2d 270, 278 (2d Cir.1989)); *see also Johnson v. Celotex Corp.*, 899 F.2d 1281, 1289 (2d Cir.1990) ("Great discretion is to be given the judge who was present throughout the trial and is best able to determine the effect of the conduct of counsel on the jury."); *Claudio*, 955 F.Supp.2d at 144.

### 1. Alternative course of action

Defendants first argue that Plaintiff's counsel violated the Court's *in limine* ruling that he could not argue that Defendants could have or should have taken an alternative course of action, as any alternate course of action was irrelevant to whether Glenn or Ugbomah acted lawfully. (Def. Mem. 4–5.) Plaintiff argues that Defendants' *in limine* request on this issue appeared only to ask the Court to prohibit Plaintiff from testifying as to alternate courses of action available to Defendants, but not inquiring or arguing as to them. (Pl. Opp'n 6–7.) Furthermore, Plaintiff argues that his counsel's four references to potential alternate courses of action did not result in a miscarriage of justice and, regardless, Defendants failed to contemporaneously object to the alleged improprieties. (*Id.* at 8.)

In Defendants' memorandum of law in support of their motions *in limine*, Defendants requested that the Court preclude "testimony or argument that the defendants could have or should have taken an alternate course of action," on the grounds it was not relevant. (Def. Mem. in Supp. of Mot. in Limine, annexed to Klein Decl.

as Ex. 13.) At a pre-trial conference on May 13, 2014, the Court ruled that any testimony of any witness must be about what he or she observed, and not grounded in speculation. (Tr. of May 13, 2014 Hr'g, annexed to McCann Decl. as Ex. A, 41:9–16.) When Defendants further argued that "Plaintiffs at trial will sometimes attempt to posit alternative options that in hindsight the police officers could have taken," the Court stated "I can't imagine that any judge would allow that. That's not an issue." (*Id.* at 41:17–22.) At trial, Plaintiff's counsel asked Glenn if he could have taken alternative courses of action, including turning into oncoming traffic and Glenn explained why he chose not to do so. (Tr. 70:16–72:2, 76:25–78:2.) In summation, Plaintiff argued that Glenn could have proceeded into oncoming traffic rather than directing Plaintiff to move. (Tr. 470:3–14, 483:20–485:5.) Defendant objected to Plaintiff's first inquiry into whether Glenn could have driven into the opposite lane. (Tr. 71:20–21.)

■ Plaintiff's counsel did not violate the Court's ruling on the *in limine* motion, which prohibited Plaintiff from testifying as to anything he had not seen or observed. There was no clear ruling that Plaintiff could not inquire as to Glenn's determination of possible alternative actions available to him. At most, as Plaintiff argues, counsel was "mistaken as to the scope of the Court's ruling." (Pl. Opp'n 8.) This does not appear to be a "deliberate attempt" to "secure a favorable verdict, at all costs," (*see* Def. Mem. 5), but rather an attempt by Plaintiff's counsel to craft his argument *without* violating the Court's rulings. To the extent there was a misunderstanding at trial, Defendants objected to the questioning and the Court considered, and overruled, the objection, further indicating that the testimony was permissibly within the scope of its *in limine* ruling. *See Guzman v. Jay*, 303 F.R.D. 186, 192 (S.D.N.Y.2014) (noting

that a motion for a new trial is not a vehicle for relitigating issues decided in *in limine* rulings, rejecting defendant's contention that plaintiff's counsel violated *in limine* rulings).

### 2. Production of narrative portion of summons

Defendants argue that Plaintiff's counsel violated the Court's ruling prohibiting him from arguing that Defendants failed to produce the second page of the summons. (Def. Mem. 5–7.) Plaintiff contends that this was not prejudicial, and that counsel only spent four sentences of the thirty-three pages of summation on the summons. (Pl. Opp'n 10–11.) Furthermore, Plaintiff argues that the Court gave ample warnings to the jury that the lawyers' statements are not evidence. (*Id.* at 11.)

At a pre-trial conference held on August 7, 2014, Plaintiff sought a "missing document" jury charge regarding the narrative portion of the summons Glenn served on Plaintiff. (Tr. of Aug. 7, 2014 Hr'g, annexed to McCann Decl. as Ex. B, 35:3–36:4.) Defendants explained that, typically, officers submit the page containing the narrative portion of the summons to the court and do not retain copies. (*Id.* at 36:7–9.) The Court determined that, if the officers had produced what was in their possession—in light of the fact that Plaintiff never made a motion to compel—a missing document charge would not be appropriate. (*Id.* at 37:18–38:10.) The Court indicated that Plaintiff was permitted to ask Glenn and Ugbomah what they wrote on the summons. (*Id.* at 38:10–14.) In proceedings prior to the start of trial, the Court reminded Plaintiff that he could ask Glenn whether the narrative portion of the summons was prepared, and what his typical practice was with regards to the summons. (Tr. 19:5–22:4.)

At trial, Plaintiff offered Exhibit 25, a two-page document with the second page of a typical summons, consisting of a narrative portion, and a third page of a typical summons, which provides a space for an officer to take notes. (Tr. 52:13–55:2.) Defendants objected that (1) Plaintiff had not laid the proper foundation for the document, and (2) Defendants did not have a copy of the document. (Tr. 55:3–5.) Exhibit 25 was admitted over objection to identify what the second page of the summons "may have looked like." (Tr. 55:6–8.) The first page describes the offense, the second page calls for a narrative, and the third page provides a space for the officer to take notes. (Tr. 54:18–56:7.) Upon questioning from Plaintiff, Glenn testified that it was not his typical practice to take notes on the third page of the summons. (Tr. 56:7–25.) He also testified that it was not his typical practice to maintain the second and third pages of a summons in his own records, though he would maintain the first page. (Tr. 60:19–61:7, 64:7–65:5.) In summation, Plaintiff's counsel argued that the summons was intentionally filled out improperly and "that's why you [the jury] haven't seen the narrative page of the summons," implying that Defendants intentionally concealed it. (Tr. 488:15–18.) At sidebar, the Court admonished Plaintiff's counsel for making this argument and warned him that, in rebuttal, he could not argue this point any further. (Tr. 532:1–13.) However, the Court determined that because the jury was recently reminded that summations are not evidence, (see Tr. 464:8–12), and would be reminded in closing instructions, (see Tr. 542:19–24), no further instruction was needed at that time. Defense counsel rebutted Plaintiff's argument in his summation, arguing that the summons was filled out and sent to the court as required and that "[t]he fact that you [the jury] don't see them doesn't mean you should infer anything, again, nefarious

on the issue. . . . It's not a coverup." (Tr. 530:4–16.)

The Court finds that its warnings to counsel, combined with its repeated instruction to the jury that summations and statements from counsel are not evidence, were sufficient to counteract any prejudice that Plaintiff's allusions to the missing document may have caused. See Tesser, 370 F.3d at 322 (upholding determination that new trial was not warranted when defendants' counsel suggested plaintiff was hiding evidence, particularly in light of the fact that plaintiff's counsel was permitted to tell the jury that defendants could have called two individuals as witnesses but chose not to); Claudio, 955 F.Supp.2d at 149 (finding that warnings to counsel and limiting instructions to jury were sufficient to counteract "any question that might have been raised in the jury's mind" regarding counsel's improper line of questioning); see also Patterson, 440 F.3d at 119 (noting that attorneys are provided " 'wide latitude in formulating their arguments' to the jury" on summation, and reversal for attorney's conduct during summation is rare (quoting Reilly v. NatWest Mkts. Grp. Inc., 181 F.3d 253, 271 (2d Cir.1999))). The Court finds that the remarks were not unduly prejudicial or confusing, and thus do not provide a basis for a new trial.

### 3. Psychological impact on J.G.

Defendants argue that Plaintiff's counsel violated the Court's ruling prohibiting him from discussing the psychological impact of the incident on J.G. (Def. Mem. 7–9.) Defendants contend it was clearly orchestrated because counsel "closed on the prohibited testimony," stating that it was good that Ms. Fraser was there to remove J.G. from the situation, that he was "clearly affected" and that he did not "think kids remember everything that happens when

they are that little." (*Id.* at 9.) Plaintiff's counsel argues that he did not intentionally elicit improper testimony, and in fact led the witness as instructed by the Court once defense counsel objected at sidebar. (Pl. Opp'n 11–12.) Plaintiff further argues that J.G.'s two references to his shock were unsolicited. (*Id.* at 12.)

At the pre-trial conference on May 13, 2014, the Court ruled that J.G. was permitted to testify as to what he did and what he observed, but that Plaintiff's counsel was not permitted to ask J.G. if he was upset. (Tr. of May 13, 2014 Hr'g 40:3–19.) During J.G.'s testimony, Plaintiff's counsel asked J.G. "How is it . . . that you remember this incident?" (Tr. 250:12–13.) Defendants objected, and at sidebar indicated their concern that Plaintiff was attempting to circumvent the Court's ruling. (Tr. 250:15–251:21.) Plaintiff indicated that J.G. would answer that he was shocked and that is what made the event memorable. (Tr. 251:9–24.) The Court permitted Plaintiff to lead the witness to elicit what he did that day, but warned counsel not to "go into whether or not it was a traumatic experience for him," stating that J.G.'s personal feelings were not relevant. (Tr. 251:25–23.) Plaintiff's counsel abided by the Court's rulings, but J.G. later volunteered the prohibited testimony on direct examination:

> **Q:** And do you remember what was being said specifically at that time between your dad and the officer?
>
> **A:** No.
>
> **Q:** Okay. What do you remember happening next?
>
> **A:** I remember that after that, my dad got arrested and that I was so shocked and surprised that I started crying and screaming, and I was wasn't [*sic*] paying attention about what was happening. Then Ms. Fraser came outside the school.

> **Q:** So Ms. Fraser is Ms. Patterson's sister, who runs your school?
>
> **A:** Yes.

(Tr. 258:2–12.) J.G. similarly mentioned the effects of the events on cross-examination:

> **Q:** So you didn't see or hear what happened between the police officer and your dad after that?
>
> **A:** No, because I was crying a lot, so I didn't pay attention about what happened. I was so in shock, so.

(Tr. 265:23–266:1.)

■ As an initial matter, J.G.'s response to both questions where he mentions "shock" are relevant to the extent that they explain why J.G. did not remember the particular events he was being asked about, and were responsive to the questions he had been asked. Furthermore, these two statements were unsolicited by Plaintiff's counsel, and Defendants made no objection to them during trial. Defendants contend that it is clear that Plaintiff's counsel "rehearsed" this with J.G., based on the fact that they both used the word "shock," and "orchestrated" a violation of the Court's ruling. Defendants point to the fact that Plaintiff referenced J.G.'s shock in closing argument as proof of that contention. (*See* Tr. 472:25–473:6 (noting that the incident "clearly affected" J.G.).) This speculation as to counsel's intentions is not supported by the record. Regardless, viewed in the context of the entire trial, this one small argument as to the emotional impact of the incident on J.G. was harmless, and there is no indication that it created any undue prejudice. Defense counsel began his summation by arguing that J.G.'s testimony was case determinative, (Tr. 498:22–499:3), reminded the jury that J.G. was not a party to the lawsuit, (Tr. 502:16–20), and encouraged the jury to believe J.G.'s testimony, (Tr. 504:8–506:20). Furthermore, defense

counsel himself raised the issue of how the incident impacted J.G., and noted it was "going to be a traumatic situation for a four year old," but appeared to blame J.G.'s state on Plaintiff's poor decisions. (Tr. 525:10–25, 531:2–9.) Plaintiff rebutted Defendants' arguments to the jury about how they should consider J.G.'s testimony. J.G.'s testimony was discussed so much in summation by both sides that one comment from Plaintiff's counsel about how J.G. was affected by Defendants' conduct was unlikely to have an impact on the jury or on the ultimate verdict. *See Valentin v. Cty. of Suffolk,* 342 Fed.Appx. 661, 663 (2d Cir.2009) ("There is no basis for concluding that Defense counsel's references to Valentin's prior convictions, which Valentin readily discussed in his own testimony and to which Valentin offered no objection at the time, created undue prejudice or passion that inflamed the jury.")

### 4. Civilian Complaint Review Board

Defendants assert, and Plaintiff does not dispute, that Plaintiff requested that both parties avoid references to the Civilian Complaint Review Board's ("CCRB") investigation relating to this action. (Def. Mem. 10–11; Pl. Opp'n 14.) Defendants argue that Plaintiff violated this agreement by saying, on cross-examination, that he made a statement to the CCRB. (Def. Mem. 10–12.) Defendants further argue that this "obviously choreographed" violation caused "undue prejudice to [D]efendants by making the jury think that there had been an investigation into the allegations in this case when in fact [P]laintiff's complaint to CCRB was closed as 'complainant uncooperative.'" (Def. Mem. 11.) Plaintiff contends that this was not part of a "win at all costs strategy," but rather an inadvertent mistake made in passing, using an acronym that not all jury members would be familiar with. (Pl. Opp'n 14.)

Upon request from Plaintiff's counsel on the second morning of trial, the Court determined that it would be appropriate for Plaintiff to cross-examine Glenn on whether there had been complaints against him by members of the community, but would not permit specifics on CCRB complaints or lawsuits. (Tr. 124:4–25.) On Plaintiff's cross-examination, defense counsel attempted to impeach Plaintiff with "a statement [made] the day after the incident." (Tr. 398:7–8.) Defense counsel read a portion of the statement, and asked Plaintiff if that was accurate. (Tr. 398:10–16.) Plaintiff asked to whom the statement was made, and both the Court and defense counsel stated that it was irrelevant. (Tr. 398:17–21.) When defense counsel asked "did you make the statement or not?" Plaintiff responded "I may have said that, yes, to the CCRB, if that's what you're referring to." (Tr. 398:22–24.) The testimony proceeded without comment, and Defendants did not object to the statement later in the proceedings.

 These facts do not warrant a new trial. First, the reference to CCRB appeared to be inadvertent and happened once in a three-day trial. *See Guzman,* 303 F.R.D. at 193 (finding that a single reference to "CCR—" was a good-faith mistake that was corrected, that "most of prejudice stemming from the use of the term CCRB at trial was a result of the testimony of Defendant's own witness" and that the court was not convinced that the jury drew any inferences about the results of the investigation). Furthermore, the simple reference to the fact that Plaintiff may have given a statement to the CCRB following the incident would not necessarily lead the jury to draw any inference as to whether there was an investigation or the results of any investigation, nor is it clear to the Court that it would have any impact on the jury's ultimate verdict. *See id.* (denying motion for new trial on basis of reference to CCRB investigation, finding it

was not convinced that "the jury necessarily drew any inferences about the results of the CCRB investigation, and find[ing] [d]efendant's contention to the contrary to be speculative"); *see also Vilkhu v. City of New York,* No. 06–CV–2095, 2009 WL 537495, at *4–5 (E.D.N.Y. Mar. 3, 2009) (declining to grant new trial on grounds that trial judge permitted reference to CCRB investigation but did not permit reference to fact that excessive force claim was deemed unsubstantiated by the CCRB and remained unresolved).

### 5. Quotas

██ Defendants object that Plaintiff's counsel accused Glenn of acting pursuant to quotas with no good faith basis, and argue that this conduct warrants a new trial. (Def. Mem. 9–10.) Plaintiff's counsel asked Glenn two questions alluding to quotas, to which Defendants contemporaneously objected. (Tr. 59:16–24.) The Court sustained the objections and no answer was provided. (*Id.*) The Court instructed the jury at the beginning and end of trial that counsels' questions and arguments were not evidence, and if objections to questions were sustained, the jury should ignore the question. (Tr. 3:22–4:10, 542:19–24.) There is no suggestion that these two questions, asked in the course of a three-day trial, had any impact on the jury's verdict, and the Court does not find that this single, isolated incident of improper questioning warrants a new trial. *See Lovejoy v. Gure–Perez,* No. 10–CV–5748, 2014 WL 2459656, at *3 (E.D.N.Y. May 21, 2014) (finding no prejudice from plaintiff's "repeated[ ]" attempts to elicit testimony about excluded evidence, noting that counsel objected and the court sustained the objections, and had later instructed the jury that questions and arguments of counsel were not evidence); *see also Smith v. Lightning Bolt Prods., Inc.,* 861 F.2d 363, 370 (2d Cir.1988) (finding single improper question of witness did not warrant new trial when court immediately struck the question and cautioned the jury to disregard it, and there was no further mention of the subject within the hearing of the jury).

### 6. Defendant Ugbomah's testimony

Defendants argue that Plaintiff's counsel deliberately distorted Ugbomah's deposition testimony to indicate that Ugbomah was being untruthful, insinuating that Ugbomah remembered the *entire* incident after he had taken a break and he had the opportunity to discuss his testimony with his lawyer. (Def. Mem. 10.) Plaintiff argues that he did not distort Ugbomah's testimony. (Pl. Opp'n 13.)

On redirect examination, Plaintiff's counsel asked Ugbomah if, at his deposition, he could not recall the incident in question, which Ugbomah answered in the affirmative. (Tr. 244:24–245:3.) He then asked if "after a break, you then testified that all of a sudden, you had a vivid memory of the summons being issued after you [*sic*] initially saying you didn't?" (Tr. 245:12–14.) Ugbomah testified that he did not remember the summons being issued. (Tr. 245:17–18.) Plaintiff's counsel continued to ask Ugbomah if he testified—after returning from a break in the deposition—that he had a "vivid memory of the *summons,*" (Tr. 245:20–246:21 (emphasis added)), at which point Ugbomah stated he did not remember, (Tr. 245:22). Plaintiff's counsel asked if Ugbomah had "any reason to doubt that you said all of a sudden after a break that you had a vivid memory of the *incident,*" and Ugbomah said he did not remember. (Tr. 246:23–274:7 (emphasis added).) Upon further questioning, defense counsel asked Ugbomah: "What you said in your deposition is in the transcript that you were just shown, right?" to which Ugbomah answered in the affirmative.

Defense counsel had no other questions for Ugbomah. (Tr. 247:15–21.)

Defendants have not submitted the relevant portions of Ugbomah's deposition transcript in support of the current motion, and the Court therefore cannot evaluate Defendants' contention that Plaintiff's counsel "deliberately distorted" the testimony. However, Plaintiff's counsel's initial questioning appropriately referred to Ugbomah's memory of the summons, and only his last question referred to the incident. There is no basis to conclude that this single inconsistency, considered in the context of the other questions and the re-cross examination by defense counsel, had any impact on the jury's determination as to Ugbomah's credibility or any of the ultimate issues decided by the jury.

### 7. Cumulative effect

■ Although not explicitly argued by Defendants, the Court will consider whether the Defendants' arguments regarding Plaintiff's and Plaintiff's counsel's alleged misbehavior, in the aggregate, amount to the alleged "pattern" of misconduct that would warrant a new trial as to Plaintiff's false arrest claim. *See Claudio,* 955 F.Supp.2d at 158 (citing *Floyd v. Meachum,* 907 F.2d 347, 355 (2d Cir.1990)). Having seen the trial, observed the witnesses and counsel, and the demeanor of both counsel and the jury, the Court cannot conclude that Plaintiff's and his counsel's "statements and conduct had adversely impacted the defendant[s] and affected the outcome of the trial." *See id.* at 158–59; *cf. Hopson v. Riverbay Corp.,* 190 F.R.D. 114, 122 (S.D.N.Y.1999) (finding new trial warranted when counsel made "numerous misstatements of fact and law and repeated acts of misconduct" including unfounded allegations that opposing party lied and had been subject to disciplinary proceedings, and counsel continued to mislead the jury over sustained objections in summation).

In the context of the entire trial, the few remarks by Plaintiff and his counsel, discussed above—most of which did not bear on ultimate liability at trial—were *de minimis* or were dealt with through clear instructions to the jury at the beginning and the end of trial, and thus a new trial is not warranted on this ground. *See O'Hara v. City of New York,* 570 Fed.Appx. 21, 25 (2d Cir.2014) (finding curative instruction sufficient to avoid undue prejudice of challenged rebuttal argument); *Hopson,* 190 F.R.D. at 122 ("Conduct that is 'de minimis in the context of the entire trial' or that is appropriately dealt with by curative instructions, is not sufficient to warrant a new trial." (quoting *Pappas,* 963 F.2d at 540)).

### ii. The Court's rulings did not cause a seriously erroneous result or a miscarriage of justice

Defendants argue that "several of the Court's rulings caused a seriously erroneous result and a miscarriage of justice," including (1) prohibiting Defendants from discussing the substance of the emergency to which Defendants were responding; (2) preventing Defendants from conducting a "full" cross-examination of Plaintiff; (3) preventing Defendants from questioning Plaintiff about Dr. Dudley, Plaintiff's retained expert witness who was not called at trial; (4) refusing to instruct the jury that failure to follow a lawful order can constitute OGA; and (5) including a *respondeat superior* instruction in the jury charge.

### 1. Evidentiary rulings

■ A district court has broad discretion over the admission of evidence at trial. *Kogut v. Cty. of Nassau,* 789 F.3d 36, 47 (2d Cir.2015); *Stampf,* 761 F.3d at 203. A new trial may be warranted if the district court made substantial errors in admitting or excluding evidence, provided that the errors caused the jury to reach a

seriously erroneous result or its verdict is a miscarriage of justice. *Stampf,* 761 F.3d at 203; *Nimely v. City of New York,* 414 F.3d 381, 399 (2d Cir.2005); *Leo v. Long Island R.R. Co.,* 307 F.R.D. 314, 321 (S.D.N.Y.2015) ("[S]uch relief is not to be granted unless the movant demonstrates that the error was not harmless, that is, '[that] it is likely that in some material respect the factfinder's judgment was swayed by the error.'" (alteration in original) (quoting *Tesser,* 370 F.3d at 319)). In considering whether the error warrants a new trial, the court should consider it in light of the record as a whole. *Johnson v. Strive E. Harlem Emp't Grp.,* 990 F.Supp.2d 435, 450 (S.D.N.Y.2014) ("Where there has been an objection, a new trial is warranted if the Court's evidentiary ruling was 'clearly prejudicial to the outcome of the trial,' taking into account 'the record as a whole.'" (quoting *Marcic v. Reinauer Transp. Cos.,* 397 F.3d 120, 124 (2d Cir.2005))). If defendants failed to object to a ruling they now challenge, the court should grant a new trial only if the error is "so serious and flagrant that it goes to the very integrity of the trial." *Id.* (quoting *Marcic,* 397 F.3d at 124.) "It is well-settled, however, that Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits or otherwise taking a second bite at the apple." *Guzman,* 303 F.R.D. at 192 (internal quotation marks omitted).

### A. Substance of the emergency

Defendants first argue that the Court erred in prohibiting them from discussing the nature or substance of the emergency to which they were responding, limiting them to only describing it as a "Priority 2" on a scale of one to five, one being the most urgent. (Def. Mem. 16.) Defendants contend that the nature of the emergency—an assault in progress—was relevant to their probable cause determination, and

thus should have been permissible testimony. (*Id.* at 16–17.) Defendants argue that it "sterilized" their case and prevented them from "fully" explaining their course of action, especially in light of Plaintiff's arguments that they could have taken an alternative course of action. (*Id.* at 17.) Plaintiff argues that this ruling was proper and did not result in an unfair trial, as the nature of the emergency was not relevant and was prejudicial. (Pl. Opp'n 23–24.)

■ The fact that Defendants were responding to an emergency was relevant to the determination of whether Defendants had probable cause to believe that Plaintiff was committing OGA by interfering with their governmental function—the governmental function being the officers' response to the emergency and attempt to apprehend the perpetrator—but the *nature* of that emergency was not probative of whether Plaintiff was committing a crime. *See Cameron,* 598 F.3d at 68 (outlining elements of OGA violation, finding that effectuating an arrest is an official function). The Court determined that testimony as to the level of emergency was sufficient to convey the nature of the officers' "governmental function," but the substance of the emergency was not legally relevant to the Defendants' defense and would be unduly prejudicial to Plaintiff. (Tr. of Aug. 7, 2014 Pretrial Conference, excerpts annexed to McCann Decl. as Ex. B, 26:9–28:15, 29:5–19.) The jury heard testimony about what Defendants were doing and why, including testimony that Glenn and Ugbomah were responding to a "Priority 2" emergency and that emergencies are measured on a scale from 1 to 5 where 1 is the most urgent, and 2 is the second most urgent. (Tr. 67:8–13, 174:7–12.) Glenn also testified that they were responding in a "[stealth]-manner" to the emergency, without running their lights or sirens, so that they would not alert the

perpetrator that the police were on the way—testimony which also suggested the gravity of the situation. (Tr. 68:18–69:5.) The fact that the officers were responding to a report of a domestic violence assault adds nothing to the officers' analysis of whether Plaintiff intentionally obstructed, impaired, prevented, or attempted to prevent Defendants from responding to the emergency. *See* N.Y. Penal Law § 195.05. Given its limited probative value and chance for extreme prejudice, the Court excluded the evidence under Rule 403 of the Federal Rules of Evidence. *See Lore,* 670 F.3d at 173 (holding that it was within the Court's discretion to exclude testimony pursuant to Rule 403). Preventing Defendants from testifying to this tangential and irrelevant fact did not prevent them from "putting on an effective defense," and does not warrant a new trial.

### B. Plaintiff's cross-examination

▮▮▮ "A district court is accorded broad discretion in controlling the scope and extent of cross-examination...." *Lidle v. Cirrus Design Corp.,* 505 Fed.Appx. 72, 76 (2d Cir.2012) (quoting *United States v. Wilkerson,* 361 F.3d 717, 734 (2d Cir. 2004)); *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC,* 467 F.3d 107, 119 (2d Cir.2006) (noting that district courts have "wide latitude" in "controlling 'the mode and order' " of evidentiary presentations at trial (quoting Fed.R.Evid. 611(a))). "[T]here is a long line of cases making clear the authority of district judges to impose reasonable time limitations on trials." *E. Mishan & Sons, Inc. v. Homeland Housewares LLC,* 580 Fed. Appx. 26, 28 (2d Cir.2014) (alteration in original) (quoting *Lidle v. Cirrus Design Corp.,* 278 F.R.D. 325, 331 (S.D.N.Y.2011), *aff'd,* 505 Fed.Appx. 72 (2d Cir.2012)). "Generally, '[c]ross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility.' " *Lidle,* 505 Fed.Appx.

at 76 (alteration in original) (quoting Fed. R.Evid. 611(b)).

### (1) The length of cross-examination

Defendants object to the length of their cross-examination of Plaintiff, arguing that the Court's trial-management decisions put Defendants in the position of either holding the jury late, causing them to be "disinterested" and "hostile" to Defendants, or cutting short their cross-examination of Plaintiff. (Def. Mem. 18–19.) Defendants contend that this forced choice signaled to the jury "that [D]efendants' examination was taking too long and was not an important part of this trial" and that, "by affording [P]laintiff ample time to conduct sprawling examinations while preventing [D]efendants from conducting a full examination of [P]laintiff," it caused a seriously erroneous result and is grounds for a new trial. (*Id.*) Plaintiff argues that the Court properly exercised its discretion to manage the trial, and Defendants have not shown that the time limitation caused them any prejudice. (Pl. Opp'n 25.)

At the end of Plaintiff's direct testimony on the afternoon of the second day of trial, at side-bar, the Court asked Defendants:

**THE COURT:** How long do you expect your cross-examination to last?

**MR. FRANCOLIA:** Maybe a half-hour.

**THE COURT:** Okay. We're going to finish it today.

(Tr. 360:2–4.) Approximately twenty minutes into the cross-examination, (*see* Def. Mem. 18), in open court, the Court inquired if Defendants' counsel was "almost done" and reminded counsel that they agreed to finish the testimony that day, and counsel indicated that he wished to proceed until 5:30 PM. (Tr. 395:24–396:5.) The Court informed counsel that he had "ten minutes," referring to the earlier conversation. (Tr. 396:6.) Rather than indulging further delay at side-bar, the

Court directed counsel to proceed with his questioning. (Tr. 396:7–10.) After several more minutes of questioning, Defendants' counsel again requested a side-bar, where he stated:

> MR. FRANCOLIA: Your Honor, at this point I don't think I have much left, but the problem is, because I was only given a very limited amount of time, I'm skipping through things. What I would like to do is ask if there is a way and it's not much. I assume Mr. Klein may have redirect—that I just have permission to end my examination now and continue it tomorrow?
>
> THE COURT: Counsel, you haven't been skipping through anything. You have been asking questions [that are] very relevant. You have been fighting with this witness and you have been making comments, which you know is inappropriate. *You can take whatever time you need, but we are finishing this witness.* Do you understand that?
>
> MR. FRANCOLIA: Your Honor, I'm just going to note my objection.
>
> THE COURT: And your objection is noted for the record. Let's go.

(Tr. 405:1–18 (emphasis added).) Counsel asked three more questions, and then stated "I think I'm done," before he determined he had nothing further. (Tr. 406:1–21.) After Plaintiff's redirect examination, Defendants were given an opportunity to re-cross-examine Plaintiff, and chose not to do so. (Tr. 411:23–412:3.) Plaintiff rested, and Defendants informed the Court that they would not call any witnesses.

(Tr. 412:7–413:5.) Ultimately, the testimony went until about 5:30 PM, and the jury was excused at 5:37 PM. (Tr. 414:1–14.)

■ Defendants have not shown any prejudice from the instruction to complete the cross-examination that evening. *See Lidle*, 278 F.R.D. at 331 (noting that in order to prevail on a claim that the imposed time limit was too short, a party must show how its cross-examination was curtailed and must show prejudice). First, Defendants make no mention of what other questions or evidence they would have elicited if not for the time limit, instead relying on their repeated assertion that they were denied a "full" examination.[14] *See id.* at 332 (rejecting argument that time limit for cross-examination was prejudicial, determining that movant "failed to identify any probative, non-cumulative evidence that [they] were prevented by the time limit from presenting"). Defendants' comparison to the number of pages of trial transcript sheds no light on Defendants' contention that they did not have the same ample opportunity to conduct examination. The Court informed both parties on the morning of the second day of trial that it intended to finish the witnesses that day, and repeatedly requested that counsel on both sides be mindful of the jury's time.[15] While the Court did request that defense counsel keep his cross-examination of Plaintiff brief, defense counsel was specifically instructed that he could take what time he needed, and took until 5:30 PM— as requested—to complete his examination. *See Zinman v. Black & Decker*

---

14. Defendants' niggling about whether something was "fully" completed or simply completed, *see also supra* n. 12, fails to impress upon the Court the existence of a miscarriage of justice or the need for a new trial.

15. Additionally, throughout the course of the trial, the Court asked counsel for both parties whether they were close to completing their questioning of a particular witness, in an attempt to manage the length of the testimony and the timing of the jury's breaks. (*See* Tr. 113:13–15, 115:5–12, 356:25–257:1.) The Court explained this to the jury at the beginning of trial, stating that the jury will take specified breaks "unless there's a witness who is almost done with their testimony," in which case the Court would allow the lawyers to complete that testimony. (Tr. 8:16–23.)

*(U.S.), Inc.*, 983 F.2d 431, 436, 436 n. 3 (2d Cir.1993) (finding "occasional comments" from judge, including comment on length of a cross-examination did not show "partiality or bias" were "infrequent and minor" and did not result in prejudice). Defendants point to no evidence of prejudice, serious error or injustice created as a result of the Court's ruling. There is thus no basis to grant a new trial on this ground.[16]

### (2) Plaintiff's retained expert

Defendants contend that they should have been permitted to cross-examine Plaintiff as to his decision to retain an expert witness for trial, which expert had been criticized as unreliable in an unrelated proceeding in the Northern District of Iowa. (Def. Mem. 19–21.) Plaintiff argues that this line of questioning would have been improper and irrelevant. (Pl. Opp'n 26.)

Plaintiff retained Dr. Dudley, an expert witness, in preparation for this trial. Defendants sought to cross-examine Dr. Dudley about his testimony in a prior, unrelated litigation, where the Judge found him not credible. Plaintiff chose not to call Dr. Dudley to testify at trial, and Defendants sought to cross-examine *Plaintiff* about the fact that he retained Dr. Dudley solely for the purposes of this litigation and the fact that Dr. Dudley had been found not credible in an unrelated litigation. The Court did not permit this line of questioning, as the expert was not a treating physician and there was no basis to inquire as to

Plaintiff's decision to retain an expert where Plaintiff did not present any expert testimony. (Tr. 270:4–281:3.)

■■■ Defendants appear to concede that this line of questioning would not be probative of any substantive issue raised on direct examination, as they rightly should. Defendants' contention that Plaintiff's retention of Dr. Dudley, an "unreliable" witness, in preparation for trial calls Plaintiff's credibility into question is hollow at best. As an initial matter, the question of Dr. Dudley's credibility was moot because he did not testify at trial. In any event, Plaintiff would not have been permitted to testify as to another witness's credibility. *See Nimely*, 414 F.3d at 397–98 (noting that it is improper for a witness to testify as to the credibility of another witness, either as an expert or fact witness, out of concerns for bolstering). Furthermore, this line of questioning was not probative of Plaintiff's credibility and posed a substantial risk of juror confusion and undue prejudice. *See Parrish v. Sollecito*, 280 F.Supp.2d 145, 165 (S.D.N.Y. 2003) (denying motion for new trial, finding evidence was properly excluded to avoid prejudice and confusion). Expert witnesses, including doctors retained to evaluate physical and mental injuries, are routinely retained in anticipation of litigation. *See, e.g.*, Fed.R.Civ.P. 26(b)(4) (providing for disclosure of experts retained "in anticipation of litigation" expected to be called as witnesses at trial, limiting discovery of consultative experts); *Agron*

---

**16.** Defendants' analogy to *People v. McLeod*, 122 A.D.3d 16, 991 N.Y.S.2d 418 (2014) (slip op.) is inapposite. In *McLeod*, the criminal defendant was granted a new trial because the trial court had limited defense counsel's line of questioning that would have been probative of a witness's "bias and credibility," which violated the defendant's constitutional right to cross-examination. *Id.* at 421. As a preliminary matter, no such weighty constitutional rights are at issue in this civil case.

*Barclay v. New York*, 602 Fed.Appx. 7, 13 (2d Cir.2015) ("[T]he Sixth Amendment right of confrontation does not apply in this civil action."). Second, Defendants are not objecting to any particular line of questioning limited by the Court, but rather argue that a new trial is warranted because counsel felt rushed when the Court admonished him to be respectful of the Court's time, the jury's time, and the schedule set earlier in the day.

*v. Trustees of Columbia Univ. in City of N.Y.,* 176 F.R.D. 445, 449 (S.D.N.Y.1997) ("[Rule 26(b)(4)] is intended to allow litigants to consult experts in order to evaluate a claim 'without fear that every consultation with an expert may yield grist for the adversary's mill.'"). At most, the fact that Plaintiff may have retained an expert witness and not presented that witness is nothing more than a commentary on trial counsel's strategy, not Plaintiff's credibility. Moreover, the jury had ample opportunity to evaluate Plaintiff's credibility through other means. Excluding such questioning was not prejudicial and did not result in a miscarriage of justice.

### 2. Jury instructions

■■■■■ Erroneous or inadequate jury instructions may constitute grounds for a new trial, provided the errors are "prejudicial in light of the charge as a whole." *Lore,* 670 F.3d at 156. An erroneous jury instruction "misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *Id.* (quoting *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 153 (2d Cir.1997); *see also Turley v. ISG Lackawanna, Inc.,* 774 F.3d 140, 152 (2d Cir.2014); *Worytko v. Cty. of Suffolk,* 285 Fed.Appx. 794, 795 (2d Cir. 2008) ("Where the court's instruction misleads the jury as to the correct legal standard or where it fails to adequately inform the jury on the law, it will be deemed erroneous. An erroneous jury instruction mandates a new trial unless the error is harmless." (quoting *Cobb v. Pozzi,* 363 F.3d 89, 112 (2d Cir.2004))). An error in a jury instruction is not prejudicial "when [the court is] persuaded it did not influence the jury's verdict." *Townsend v. Benjamin Enters., Inc.,* 679 F.3d 41, 56 (2d Cir.2012). "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Lore,* 670 F.3d at 156 (quoting *Henderson v. Kibbe,* 431 U.S. 145, 155, 97 S.Ct. 1730, 52

L.Ed.2d 203 (1977)). A new trial is not warranted if the instructions "read as a whole, presented the issues to the jury in a fair and evenhanded manner." *Turley,* 774 F.3d at 152 (quoting *Lore,* 670 F.3d at 156).

### A. Failure to follow a lawful order

Defendants contend that the Court's refusal to instruct the jury that failure to follow a lawful order can constitute OGA warrants a new trial. (Def. Mem. 21–22.) Defendants raised this matter with the Court before trial, requesting a jury instruction that an officer has probable cause to arrest for OGA if the individual refuses to comply with an order from a police officer. (Defendants' Proposed Jury Instructions 8, Docket Entry No. 90.) In their proposed jury instructions, Defendants relied on two district court cases to support their contention. (*See id.* (citing *Johnson v. City of New York,* No. 05–CV–7519, 2008 WL 4450270, at *10 (S.D.N.Y. Sept. 29, 2008) and *Rasmussen v. City of New York,* 766 F.Supp.2d 399, 403 (E.D.N.Y.2011))). The Court refused to add the proposed language. (Tr. 442:15–20.) Defendants' position is no more persuasive or consistent with New York State law now than it was when the Court denied their initial request for this jury instruction.

■■■■ Failure to follow a police officer's instruction is not OGA in every circumstance, and a jury instruction adopting this reductionist view would run a serious risk of misleading the jury. Disobeying a police officer alone is not necessarily OGA, as "[c]ourts have made clear that the statute requires *physical* interference with police action," including encroachment on police officers' work, or some other independently unlawful act to support an OGA arrest. *Hilderbrandt v. City of New York,* No. 13–CV–1955, 2014 WL 4536736, at *4–6

(E.D.N.Y. Sept. 11, 2014) (collecting cases); *see Evans v. City of New York,* No. 12–CV–5341, 2015 WL 1345374, at *8–9 (E.D.N.Y. Mar. 25, 2015); *United States v. Marrero,* No. 05–CR–942, 2014 WL 3611625, at *4 (E.D.N.Y. July 22, 2014) (noting that OGA requires physical force or interference or an independently unlawful act); *Dowling,* 2013 WL 5502867, at *8 (noting "mere words" do not constitute OGA, and officer must have had reasonable belief plaintiff was doing something other than voicing his disagreement or complaining); *People v. Dumay,* 23 N.Y.3d 518, 524, 992 N.Y.S.2d 672 (2014) (noting that interference must be physical in nature, but can be minimal if intended to frustrate police activity); *Matter of Davan L.,* 91 N.Y.2d 88, 91, 666 N.Y.S.2d 1015, 689 N.E.2d 909 (1997) ("[P]urely verbal interference may not satisfy the 'physical' component under Penal Law § 195.05." (citations omitted)). Even the cases cited by Defendants show that courts have generally found that failure to follow a lawful order may constitute probable cause to arrest for OGA only when such failure is combined with a physical intrusion or unlawful act that independently interferes with an official act. *See, e.g., Wilder v. Vill. of Amityville,* 288 F.Supp.2d 341, 345 (E.D.N.Y.2003) (finding officers had probable cause to arrest for OGA when plaintiff "ignored three orders to move away from what was soon to be a zone of danger [due to falling tree branches], her presence in which would have prevent[ed] local officials from removing the tree") *aff'd,* 111 Fed. Appx. 635 (2d Cir.2004); *see also Lennon,* 66 F.3d at 424 (holding that officers were entitled to qualified immunity because they reasonably believed they had probable cause to arrest for OGA when plaintiff locked herself into and refused to leave a car when the officers were attempting to assist third-party owner in recovering the vehicle, believed to be stolen); *Ostroski v. Town of Southold,* 443 F.Supp.2d 325, 338–

39 (E.D.N.Y.2006) (finding defendant entitled to qualified immunity on malicious prosecution claim because facts showed that officers had probable cause to arrest plaintiff for OGA because she struck the officer who was attempting to search her residence). At least one New York State court has specifically concluded that "mere verbal refusal" to provide an officer with a driver's license, registration and proof of insurance cannot constitute OGA. *People v. Alston,* 9 Misc.3d 1046, 805 N.Y.S.2d 258, 260–61 (N.Y.Crim.Ct.2005).

The Court instructed the jury that Glenn contended he had probable cause to arrest for three crimes: failure to yield to an emergency vehicle, OGA, and disorderly conduct. (Tr. 553:23–554:3.) The Court defined probable cause as follows:

> Probable cause to arrest exists when a police officer has knowledge or reasonably trustworthy information sufficient to convince a person of reasonable caution to believe that a crime has been committed by the person to be arrested. Probable cause does not require an actual showing of criminal activity, only the objectively reasonably—reasonable probability of criminal activity at or before the moment of arrest.

(Tr. 552:21–553:3.) As to OGA, the Court explained:

> A person is guilty of obstructing governmental administration if he or she intentionally obstructs, impairs, prevents, or attempts to prevent a public servant from performing an official function by means of intimidation, physical force or interference, or by means of any independently unlawful act. Interference requires more than mere words alone.

(Tr. 554:12–19.) In fact, the instruction mirrored the OGA statute closely. *See* N.Y. Penal Law § 195.05. Given the nuanced, fact-specific analysis that pervades the case law regarding probable cause to

arrest for OGA, it cannot be said that the Court erred in failing to instruct the jury that any failure to follow a lawful instruction from a police officer constituted probable cause to arrest for OGA. Even assuming it was erroneous not to include Defendants' proposed instruction, the charge given to the jury did not mislead the jury as to the correct legal standard at issue, and therefore does not warrant a new trial. *See Turley,* 774 F.3d at 154.

### B. *Respondeat superior* instruction

Defendants argue that it was error for the Court to include a *respondeat superior* charge against the City of New York in the jury instructions. (Def. Mem. 22–23.) Defendants contend that liability against the City is not a question for the jury, but rather a question of law for the Court to decide. (*Id.* at 22.) Defendants object on the basis that it prejudiced the jury to award a higher verdict against the City, a "deep pocket" Defendant. (*Id.* at 22–23.) Plaintiff argues that it was legally correct to include the charge because Plaintiff brought a claim for *respondeat superior* liability, and omitting the instruction would make "no legal sense insofar it is the Court's job to present the jury with all applicable law necessary to evaluate [P]laintiff's claims prior to deliberation. . . ." (Pl. Opp'n 28–29.)

▮ The Court instructed:

In addition to plaintiff's federal civil rights claim, plaintiff claims that Defendant Glenn committed the state law torts of false arrest, assault, and battery, and that the City of New York, as their employer, is liable for the torts committed by Defendant Glenn.

(Tr. 560:19–23.) It further explained:

Under New York Law, the City is liable for the acts of a city employee when those acts have been performed within the scope of his employment. In this case, the parties agree that Defendants Glenn and Ugbomah were acting within the scope of their employment. As a result, if you find that plaintiff establishes by a preponderance of the evidence that Defendant Glenn is liable— that Defendant Glenn and/or Defendant Ugbomah is liable, either for false arrest, assault or battery, or all three, then [D]efendants concede that the City of New York is liable.

(Tr. 563:22–564:6.) These instructions do not mislead the jury as to the legal standard to be applied to Plaintiff's claim against the City of New York such that the instructions would warrant a new trial. *See Holland v. City of Poughkeepsie,* 90 A.D.3d 841, 935 N.Y.S.2d 583, 589 (2011) ("Moreover, unlike the claims pursuant to 42 [U.S.C.] § 1983, a municipality may be held vicariously liable for torts committed by its employee while acting within the scope of his or her employment," including false arrest. (citations omitted)). Furthermore, there is no evidence to support Defendants' "deep pocket" theory, as the jury made specific factual findings that support its verdict that Glenn is liable for false arrest. Because Defendants have presented only speculation to support the motion for a new trial on these grounds, the Court finds no risk of a miscarriage of justice.

### iii. The jury did not reach a verdict that is erroneous on its face

Defendants contend that the jury's verdict is contrary to law and erroneous on its face because the jury found for Plaintiff as to the false arrest claim, but for Glenn as to the battery claim. (Def. Mem. 23.) Defendants argue that a battery must necessarily follow from an unlawful arrest. (*Id.*) Plaintiff asserts that the verdict was not inconsistent, because, based on the jury charge, a jury could "reasonably conclude that although Glenn falsely arrested [P]laintiff, the force Glenn used to arrest [P]laintiff was no more than what Glenn

believed to be reasonably necessary, and thus that Glenn thus [*sic*] did not commit a battery." (Pl. Opp'n 30.)

 A jury verdict need not be consistent to be valid, and an inconsistency between general verdicts on a plaintiff's federal and state law claims does not necessarily require retrial. *See Cash,* 654 F.3d at 343 ("[C]onsistent jury verdicts are not, in themselves, necessary attributes of a valid judgment [in a civil action]." (alterations in original) (quoting *Globus v. Law Research Serv., Inc.,* 418 F.2d 1276, 1290 n. 17 (2d Cir.1969))). If the jury's general verdicts can be "harmonized rationally," the court need not order a new trial. *See Kosmynka v. Polaris Indus., Inc.,* 462 F.3d 74, 82 (2d Cir.2006); *see also Cunningham v. Town of Ellicott,* 310 Fed.Appx. 448, 449 (2d Cir.2009) (noting that even if special verdict answers appear inconsistent with general verdict, if any view of the case makes them consistent, the case must be resolved that way); *In re Vivendi Univ., S.A. Sec. Litig.,* 765 F.Supp.2d 512, 552 (S.D.N.Y.2011) ("It is well-settled that '[w]hen confronted with a potentially inconsistent jury verdict, the court must adopt a view of the case, if there is one, that resolves any seeming inconsistency.'" (alteration in original) (quoting *Turley v.*

*Police Dep't,* 167 F.3d 757, 760 (2d Cir. 1999))).

Defendants failed to raise their inconsistency objection prior to the jury's discharge, and thus have waived this argument.[17] *See Jackson v. City of New York,* 606 Fed.Appx. 618, 620–21 (2d Cir.2015); *Cash,* 654 F.3d at 342 (citing *Kosmynka,* 462 F.3d at 83); *Perks v. Town of Huntington,* 234 Fed.Appx. 8, 10 (2d Cir.2007); *In re Vivendi Univ.,* 765 F.Supp.2d at 550 ("It is well established that a party waives its objection to any inconsistency in a jury verdict if it fails to object to the verdict prior to the excusing of the jury." (quoting *Kosmynka,* 462 F.3d at 83)). However, based on the factual findings made by the jury and the fact that the jury clearly concluded Glenn did not have probable cause to arrest Plaintiff, any error as to the battery claim was in Defendants' favor. *See Rucks,* 96 F.Supp.3d at 152–54, 2015 WL 1433383, at *13–14 (granting judgment as a matter of law to plaintiff on assault and battery claims when interrogatory responses show that defendant officers had no probable cause to arrest the plaintiff and thus all force used to effect his unlawful arrest constituted battery, and any threatened use of force constituted assault). Thus, the Court sees no fundamen-

---

**17.** Even if Defendants had preserved the argument, it would fail. As to the battery claims, the Court instructed the jury that Glenn was entitled to use physical force to effect an arrest of someone he reasonably believed to have committed an offense. *Cf. Rucks v. City of New York,* 96 F.Supp.3d 138, 152–53, 2015 WL 1433383, at *13 (S.D.N.Y. 2015) (noting that under New York law, if an arrest in unlawful, any use of force against a plaintiff may constitute assault or battery, regardless of whether the force would have been reasonable if used in the course of a lawful arrest); *Sulkowska v. City of New York,* 129 F.Supp.2d 274, 294 (S.D.N.Y.2001) (same) (collecting cases). While the Court did instruct the jury that a police officer may

use force when attempting to effectuate an arrest of a person he reasonably believes to have committed an offense, the Court did not explicitly instruct the contrapositive: that any force used to complete an arrest would be unlawful or offensive under New York law if the officer did not have a reasonable belief that the individual committed the offense in question. (Tr. 562:18–563:21.) Neither party objected to this charge. *See Kosmynka v. Polaris Indus., Inc.,* 462 F.3d 74, 84 (2d Cir. 2006) (a party waives its right to object to an inconsistent verdict when it is caused by a jury instruction or verdict sheet and there was no objection to the instruction or verdict sheet prior to the submission of the case).

tal error warranting a new trial. *See Perks*, 234 Fed.Appx. at 10.

Defendants have failed to demonstrate that any potentially improper conduct on the part of Plaintiff and Plaintiff's counsel, rulings by the Court, or inconsistency in the jury verdict led to a seriously erroneous verdict or a miscarriage of justice, warranting a new trial. Thus, Defendants' motion for a new trial pursuant to Rule 59 is denied.

### d. Vacatur or reduction of jury verdict

Defendants argue that the damages award is excessive and should be vacated and returned for a new trial as to damages, or, in the alternative, the award should be reduced as objectively unreasonable. (Def. Mem. 23–24.) Defendants contend that Plaintiff's injuries were only minor, including a headache and some wrist pain, and "garden variety" emotional damages. (Def. Reply Mem. 9–10.) Plaintiff argues that the award falls within a reasonable range for the type of physical and emotional injuries that Plaintiff suffered, and thus should be upheld. (Pl. Opp'n 31–35.)

A court has discretion to order a new trial if the verdict appears to be seriously erroneous, and this "discretion includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Lore*, 670 F.3d at 177 (quoting *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996)); *see also Roberts v. United Parcel Serv., Inc.*, 115 F.Supp.3d 344, 372–73, 2015 WL 4509994, at *24 (E.D.N.Y. July 27, 2015) ("A trial court may grant remittitur where it deems a damages verdict excessive."). In considering motions for a new trial or remittitur on a state law claim, "[t]he role of the district court is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered." *Stampf*, 761 F.3d at 204 (alteration in original) (quoting *Gasperini*, 518 U.S. at 435, 116 S.Ct. 2211); *see Patterson*, 440 F.3d at 119–20. Under New York law, an award is excessive or inadequate "if it deviates materially from what would be reasonable compensation." *Stampf*, 761 F.3d at 204 (quoting N.Y. C.P.L.R. § 5501(c)); *Lore*, 670 F.3d at 177; *Patterson*, 440 F.3d at 119 (noting that the state standard requires "a more exacting review" than the federal standard). In reviewing the same motion on a federal claim, a court's review of a compensatory damage award is "narrow," and a jury's award may be set aside as excessive only when the award is "so high as to shock the judicial conscience."[18] *Leo*, 307 F.R.D. at 321–22 (internal quotation marks and citation omitted); *see also Turley*, 774 F.3d at 162 (noting compensatory damage award may not be set aside as excessive unless it is "so high as to shock the judicial conscience and constitute a denial of justice" (quoting *DiSorbo v. Hoy*, 343 F.3d 172, 183 (2d Cir.2003))). Under both standards, a court should look to awards in comparable cases, bearing in mind the unique facts and circumstances of each case. *See Stampf*, 761 F.3d at 204; *Dotson v. City of Syra-*

---

**18.** Defendants do not appear to argue that there is "an error that caused the jury to include in the verdict a quantifiable amount that should be stricken," which is the other ground for vacating a jury's verdict. *See Leo v. Long Island R.R. Co.*, 307 F.R.D. 314, 321 (S.D.N.Y.2015) (quoting *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 165 (2d Cir.1998)); *Munafo v. Metro. Transp. Auth.*, 381 F.3d 99, 105 (2d Cir.2004) (holding that Rule 59(e) permits a court to alter or amend a judgment "to correct a clear error of law or prevent manifest injustice" (internal quotation marks omitted)).

*cuse,* 549 Fed.Appx. 6, 8 (2d Cir.2013); *Tretola v. Cty. of Nassau,* 14 F.Supp.3d 58, 83 (E.D.N.Y.2014) (quoting *Scala v. Moore McCormack Lines,* 985 F.2d 680, 684 (2d Cir.1993)). Where, as here, the jury's damages award was not segregated between the state and federal claims, courts typically adhere to the standard of review which provides the most complete recovery. *See Singleton v. City of New York,* 496 F.Supp.2d 390, 393 (S.D.N.Y.2007) (citing *Magee v. U.S. Lines, Inc.,* 976 F.2d 821, 822 (2d Cir.1992)) *aff'd,* 308 Fed.Appx. 521 (2d Cir.2009).

 "An individual subjected to a false arrest is entitled to two types of compensatory damages: (1) for loss of liberty and (2) for physical and emotional distress." *Thomas v. Kelly,* 903 F.Supp.2d 237, 262 (S.D.N.Y.2012)[19] (citing *Martinez v. Port Auth. of N.Y. & N.J.,* 445 F.3d 158, 161 (2d Cir.2006) and *Kerman v. City of New York,* 374 F.3d 93, 125 (2d Cir.2004)); *see also Martinez,* 445 F.3d at 161 (noting that loss of liberty is separately compensable from emotional distress). As "awards for mental and emotional distress are inherently speculative" and the judicial system "has an obligation to ensure that such awards for intangibles be fair, reasonable, predictable and proportionate," greater scrutiny is given to large jury awards for mental and emotional harm to ensure that they are in line with comparable cases. *Turley,* 774 F.3d at 162 (citing *Stampf,* 761 F.3d at 205 and *Payne v. Jones,* 711 F.3d 85, 93 (2d Cir.2013)). "Emotional distress awards within the Second Circuit can generally be grouped into three categories of claims: 'garden-variety,' 'significant' and 'egregious.'" *Olsen v. Cty. of Nassau,* 615 F.Supp.2d 35, 46 (E.D.N.Y.2009) (internal quotation marks omitted). Awards for "garden-variety" emotional distress, where the evidence of the harms comes from the plaintiff's testimony alone, vary widely in amount but are typically lower than those in other cases. *Patterson,* 440 F.3d at 120 (noting that the Second Circuit has upheld awards up to $125,000 for " 'subjective distress' not accompanied by medical treatment"); *Roberts,* 115 F.Supp.3d at 372–73, 2015 WL 4509994 at *24 (" 'Garden variety' [emotional distress] claims generally merit awards of approximately $30,000–$125,000"); *see also Stampf,* 761 F.3d at 206–07 (evaluating awards in "garden variety" emotional distress cases); *Lore,* 670 F.3d at 177 (discussing damages for "garden variety" emotional distress under New York law).

Plaintiff was awarded $150,000 in compensatory damages for his false arrest claim. (Verdict Sheet 2.) Defendants argue that Plaintiff's single hour of confinement does not warrant an award greater than $15,000, which Defendants contend is more than twice the average damages awarded per hour of confinement. (Def. Mem. 26 (citing *Robinson v. Holder,* No. 07–CV–5992, slip op. at 14–16 (S.D.N.Y. July 2, 2008) *report and recommendation adopted at* 2008 WL 2875291 (S.D.N.Y. July 22, 2008))). However, this argument has two faults: first, Defendants only consider Plaintiff's loss of liberty, and not his physical or emotional damages resulting from the false arrest;[20] second, while the

---

**19.** The jury verdict in *Thomas* was ultimately set aside' pursuant to Rule 60(b)(3) of the Federal Rules of Civil Procedure, due to the plaintiff's failure to disclose an agreement to pay a witness a percentage of his award in the case in exchange for favorable testimony. *Thomas v. City of New York,* 293 F.R.D. 498, 505–07 (S.D.N.Y.2013), *appeal dismissed* (2d Cir. Sept. 30, 2013).

**20.** Defendants contend that Plaintiff cannot recover for physical injuries because the jury did not find in Plaintiff's favor as to his excessive force or battery claims. (Def. Reply Mem. 9.) Defendants cite to no case law in support of their argument that Plaintiff cannot be compensated for his physical pain and injuries sustained during his false arrest. *See Alla v. Verkay,* 979 F.Supp.2d 349, 372

length of detention, and average award based on length of detention, may be an important factor in determining damages, Defendants' mechanical calculation ignores the requirement that the Court must consider the unique circumstances of each case. *See Sinkov v. Americor, Inc.,* 419 Fed.Appx. 86, 93 (2d Cir.2011) (noting that the "task is not to balance the number of high and low awards and reject the verdict … if the number of lower awards is greater"); *Kerman,* 374 F.3d at 125 (noting that damages for loss of liberty, frequently considered in terms of hours, "are separable from damages recoverable for such injuries as physical harm, embarrassment, or emotional suffering"); *Abdell v. City of New York,* No. 05–CV–8453, 2014 WL 3858319, at *3 (S.D.N.Y. Aug. 5, 2014) ("There is [ ] no requirement that a jury compute damages on an hourly basis. The jury could have rationally determined that the injury of being wrongfully arrested and imprisoned—fear, uncertainty, shame, and loss of dignity and agency—is approximately the same whether the detention lasted 20 hours or 40 hours.").

 Mindful that a district court must afford some deference to a jury's determination of damages, the Court finds that the $150,000 award is not excessive. While it may be at the higher end of reasonable awards, the jury's determination of damages does not deviate materially from a reasonable compensation awarded in similar cases and is not so high as to shock the judicial conscience. *See Martinez,* 445 F.3d at 160 (noting that the "least intrusive" way to calculate remittitur would be to remit the award "only to the *maximum* amount that would be upheld by the district court as not excessive"). While the

parties failed to bring to the Court's attention any case directly comparable to this one, $150,000 is within the range of reasonable awards for Plaintiff's combined injuries including (1) approximately one hour of lost liberty, (2) some minor physical pain and injury, and (3) past and future emotional harm, including fear, panic and humiliation.

The parties agree that the testimony showed that Plaintiff was detained for approximately one hour, during which time he was sitting either in his own vehicle or in the back of Glenn's patrol vehicle on a warm June day, which itself warrants compensation for loss of liberty. Additionally, Plaintiff suffered wrist pain during the incident, a headache following the incident, and sustained marks on his wrists from the handcuffs. (Tr. 293:20–294:6, 326:12–23, 344:20–345:24, 367:8–24; Pl. Ex. 5.) These injuries alone may warrant damages in the amount that Defendants urge the Court to adopt. *See Kelly v. Kane,* 98 A.D.2d 861, 470 N.Y.S.2d 816, 818 (1983) (upholding compensatory damage award of $5000 (approximately $12,000 in 2015 dollars) [21] where plaintiff was "roughed up, handcuffed in a hurtful manner, shoved into the patrol car" and taken to the police station and booked, but released after approximately one hour and fifteen minutes, making no mention of emotional harm); *cf. Mason v. City of New York,* 949 F.Supp. 1068, 1075 (S.D.N.Y.1996) (ordering remittitur of all but $10,000 (approximately $15,000 in 2015 dollars) of $100,000 award where plaintiff was handcuffed to a chair for two hours in the airport, did not sustain physical injuries, was out of public view, and did not describe emotional harm).

(E.D.N.Y.2013) (including physical pain as a factor in determining whether remittitur on false arrest damages award was warranted, even when jury awarded separate damages for excessive force).

**21.** All approximate conversions were reached using the Bureau of Labor Statistics' CPI Inflation Calculator, which is available at http://www.bls.gov/data/inflation_calculator.htm.

However, Plaintiff also testified that he suffered substantial emotional harm from being handcuffed in front of J.G., J.G.'s day care provider and the public on the street, seeing his young child in extreme distress while Plaintiff was arrested, and from the trauma, embarrassment and humiliation that accompanied that exposure both during the arrest and thereafter. (*E.g.*, Tr. 328:9–15, 353:9–12, 353:22–356:8.) He testified that he was "plagued" by the incident every day, and was embarrassed in front of his child and his neighbors when they remembered the arrest. (Tr. 351:14–352:18.) Courts in this Circuit have permitted awards of similar magnitude for false arrest claims resulting only in garden variety emotional distress. *See Gardner v. Federated Dep't Stores,* 907 F.2d 1348, 1353–54 (2d Cir.1990) (citing New York State cases and ordering remittitur of award to $200,000 (approximately $385,000 in 2015 dollars), $50,000 for deprivation of liberty and $150,000 for pain and suffering, where plaintiff was falsely arrested and held for approximately eight hours, and suffered a jaw injury and emotional distress); *Thomas,* 903 F.Supp.2d at 263–64 (declining to remit $125,000 award (approximately $130,000 in 2015 dollars) in compensatory damages for a false arrest claim when the plaintiff "spent approximately forty-five minutes laying chest-down in the snow, handcuffed, while police officers physically and verbally abused him in front of his *girlfriend and neighbors*," and was then forcibly taken to a hospital in a restraint jacket and sedated, where he was detained for six hours); *Martinez v. Gayson,* No. 95–CV–3788, 1998 WL 564385, at *6 (E.D.N.Y. June 30, 1998) (reducing compensatory damages award to $160,000 (approximately $234,000 in 2015 dollars) for false arrest and malicious prosecution claims when the plaintiff was arrested at work and detained for approximately five hours, suffering humiliation but no physical injuries, tried on subse-quent criminal charges and acquitted); *King v. City of New York,* No. 92–CV–7738, 1996 WL 737195, at *4–5 (S.D.N.Y. Dec. 24, 1996) (ordering new trial or remittitur from $300,000 to $200,000 (approximately $304,000 in 2015 dollars) on claims of false arrest, malicious prosecution, assault and battery, where plaintiff suffered "no permanent injuries or loss of earnings, but he received bruises, black eyes, abrasions, a gash in his head, and other multiple blunt trauma" and suffered long-term emotional harm, humiliation and destruction of interpersonal relationships); *Byrd v. N.Y.C. Transit Auth.,* 172 A.D.2d 579, 568 N.Y.S.2d 628, 630 (1991) (reducing compensatory damages award to $250,000 (approximately $438,000 in 2015 dollars) for false imprisonment, malicious prosecution, and assault, when plaintiff suffered scarring and post-traumatic stress disorder); *Bert v. Port Auth. of N.Y. & N.J.,* 166 A.D.2d 351, 561 N.Y.S.2d 416, 416–17 (1990) (accepting reduced $100,000 award (approximately $183,000 in 2015 dollars) for false imprisonment lasting three and a half hours where the "incident had racial overtones," and plaintiff suffered emotional injuries and a strained relationship with his stepdaughter). Similarly, courts have approved jury verdicts of up to $125,000 for other claims resulting in garden variety emotional distress. *See Patterson,* 440 F.3d at 120 (approving award for $100,000 (approximately $122,000 in 2015 dollars) in hostile work environment and intentional infliction of emotional distress case, where only emotional harm was "garden variety"); *Meacham v. Knolls Atomic Power Lab.,* 381 F.3d 56, 78 (2d Cir.2004) (upholding award of $125,000 (approximately $167,000 in 2015 dollars) for emotional distress, including "shock, nightmares, sleeplessness, humiliation, and other subjective distress" resulting from employment discrimination) *vacated on other grounds sub nom. KAPL, Inc. v. Meacham,* 544 U.S.

957, 125 S.Ct. 1731, 161 L.Ed.2d 596 (2005); *see also Stampf,* 761 F.3d at 208 (ordering remittitur or new trial on damages on malicious prosecution claim resulting from false arrest at work unless plaintiff accepted award of $100,000 for past emotional harm and $20,000 in future emotional harm, noting the incident caused her emotional distress resulting in shame, decline of interpersonal relationships, alcoholism, and trouble sleeping without medication). Accordingly, the Court declines to order remittitur or a new trial as to damages.

### III. Conclusion

For the foregoing reasons, the Court denies Defendants' motion for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, and Defendants' motion for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure. The Court also denies Defendants' motion to vacate or reduce the jury verdict.

SO ORDERED.

